(Decided January 8th, 1896.)

---

FRANCIS P. HAMILTON AND OTHERS *vs.* GEORGE W. CARROLL AND OTHERS, COUNTY COMMISSIONERS OF CHARLES COUNTY.

*Constitutional Law—Title of Statute—Special Law—Delegation of Legislative Power—Contested Election—Jurisdiction of Equity— Removal of County Seat.*

The Act of 1894, c. 546, was entitled "An Act to provide for the removal of the county seat of Charles County from Port Tobacco to La Plata or Chapel Point, if the legal and qualified voters of said county shall so determine, and to provide for the erection of a court-house and jail at such place as shall be so determined on," etc. By the Act itself the question submitted to the voters was whether the county seat should be located at La Plata or Chapel Point, and did not in terms submit the direct question whether the county seat should be removed from Port Tobacco, its then location. *Held*, that the Act provided for the removal and that the subject was sufficiently described in the title, as required by Art. 3, sec. 29 of the Constitution.

*Held*, also, that the above mentioned Act was not within the prohibition of Constitution, Art. 3, sec. 33, providing that no special law shall be passed in a case for which provision is made by general law, since there is no general law concerning the location of county seats.

*Held*, also, that said Act is not invalid as being a delegation of legislative power to the people, since the location of a county seat is a matter of merely local concern which the Legislature has a right to submit to the determination of the people directly interested.

A Court of Equity has no jurisdiction to determine an election contest of any kind.

The bill in this case alleging irregularities in the conduct of the election provided for by the above-mentioned Act, and asking that the same be declared null and void, was dismissed.

Appeal from a decree of the Circuit Court for Charles County (BRISCOE, C. J., BROOKE and CRANE, JJ.), sustaining a demurrer to the bill of complaint in this case and dismissing the same. The prayer of the bill was that the " County Commissioners of Charles County, their agents and servants, may, by writ of injunction issued out of this Court, be restained and enjoined from issuing any of the bonds described in section 6 of chapter 546 of the Acts of 1894, to any person or persons, corporation or corporations, committee or committees whatsoever, or from acting under or in any manner carrying out the said Act of 1894, chapter 546. And the said Act of 1894, chapter 546, may be declared unconstitutional, null and void. And that the said pretended election may be declared null and void."

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, and ROBERTS, JJ.

*Wm. Pinkney Whyte* and *F. M. Cox* (with whom was *C. C. Lancaster* on the brief), for the appellants.

It appears from the averments of the bill that these complainants, as taxpayers of the county, and others similarly situated, in whose behalf, as well as their own, the bill is filed, constitute a class specially damaged by the alleged unlawful act of the corporation in the alleged increase of the burden of taxation upon their property, situated within the county. The complainants have, therefore, a special interest in the subject-matter of the suit, distinct from that of the general public. *The Mayor and City Council of Baltimore* v. *Gill*, 31 Md. 393; *Commissioners of Clay County* v. *Markle*, 46 Ind. 104; *Rice* v. *Smith*, 9 Iowa, 570; *Rickey* v. *Williams*, 8 Wash. 479; *Sweatt* v. *Faville*, 23 Iowa, 328; *Solomon* v. *Fleming*, 34 Neb. 40; *Hamilton* v. *Tucker*, 38

W. Va. 71; *Colton* v. *Hanchette*, 13 Ill. 615; *Merrill* v. *Plainfield*, 45 N. H. 126; *Beach on Injunctions*, vol. 2, § 1386 and note 1.

The jurisdiction of a Court of Equity to take cognizance of the constitutional questions presented, and to inquire by this proceeding whether any valid law has been passed, under which the county seat is about to be removed, results from the fundamental principles of equity jurisdiction and can hardly be questioned. *Todd* v. *Rustad*, 43 Minna. 500; *Solomon* v. *Fleming*, 34 Nebraska, 40; *Thomas* v. *Commissioners*, 5 Inda. 4. The equitable jurisdiction to investigate frauds and irregularities in an election for the removal of a county seat, where no statutory contest has been given, is also well established by authorities. *Mc-Crary on Elections*, § 458; *Bowen* v. *Smith et al.*, 47 Ill., 486; *People, ex rel.* v. *Wiant*, 48 Ills. 268; *Cokers' Clay Co.* v. *Markle*, 46 Ind., 104; *Rice* v. *Smith*, 9 Iowa, 570; *Sweatt* v. *Faville*, 23 Ibid, 328; 6 *Am. & Eng. Encyc. of Law*, 392. As to the questions of laches, we contend that if the bill is filed within the period of statutory limitation, it is sufficient. *Sweatt* v. *Faville*, 23 Iowa, 326.

*The Constitutional Questions.*—Section 5 of the bill raises the question of the misleading title of the Act of 1894, chapter 546, as invalidating the Act. The question of the removal of the county seat of Charles County had been twice before submitted to the voters of Charles County, first, by the Act of 1882, chapter 494; and, second, by the Act of 1892, chapter 260. In both of these Acts it was left to the vote of the people to determine whether their county seat should be removed from Port Tobacco, and in both cases they determined by decisive majorities that it should not. The Act of 1894, chapter 546, however, made an essential departure from the previous Acts, in that it absolutely removed the county seat from Port Tobacco and left to the people to determine only the question whether it should be located at La Plata, which had been twice before rejected, or one other place named in the bill

and selected by its authors.    Yet this last named Act gave
no intimation at all in its title of this essential departure,
but, on the other hand, by preserving the identical language
of the titles of the previous Acts, necessarily induced mem-
bers of the Legislature, and all others concerned, to believe
that the retention of their county seat at Port Tobacco was
still left to the choice of the people.    The title was, there-
fore, essentially misleading and vitiated the Act.

The title of this Act of 1894, ch. 546, describes the sub-
ject to be "to provide for the *removal* of the county seat of
Charles County *from* Port Tobacco to La Plata, or Chapel
Point, if the legal and qualified voters shall *so* determine,"
which said title would lead the legislators and the taxpayers
and voters to suppose that the question to be submitted to
popular vote, was "should the county seat be *removed* from
Port Tobacco, and if so, to which place named in the title ;
but in section 2 of the enactment, the question of *'removal'*
from Port Tobacco is absolutely ignored, and the only
question submitted is 'whether or not the county seat shall
be *'located'* at La Plata or Chapel Point.' "    If this is not
"discordant matter introduced into the body of the statute,"
at war with its title, what could be ?    The question sug-
gested in the title is, *"removal* from Port Tobacco to one or
other place," but the enacting clause is as to *"location"* at
La Plata or Chapel Point.    This provision becomes im-
portant in view of the fact that, while the constitution re-
quires that every bill shall be read three several times ; by
the rules of the General Assembly made in pursuance of
another section of the Constitution, some of these required
readings are by title only.

It becomes more important in its applicatton to local bills,
because, by the rules also of the General Assembly local
bills are never printed ; and, in point of fact, as is well
known to all who have served in the Legislature, few
local bills, unless they be very short, ever have any full
reading at all.    In New York, this constitutional limitation
is confined to local bills, and the Courts of that State are

very rigorous in its enforcement.    The Courts have shown
some liberality in construing these provisions, in aid of
legislation, as they relate to multifariousness and inaptness
in the description of a single subject-matter ; but whenever
they have been brought to the consideration of a *misleading*
title they have been inexorably strict in the enforcement of
the constitutional limitation.    *Sutherland on Statutory Con-
struction*, sec. 90 ; *People* v. *Commissioners of Highways*, 53
Barb. 70 ; *People* v. *Allen*, 42 New York, 404 ; *Contieri* v.
*New Brunswick*, 44 N. J. L., 58 ; *Moses* v. *Mayor, &c.*, 52
Ala. 198 ; *Anderson* v. *Hill*, 54 Mich. 477.    It is submitted
that if the misleading title to the Act of 1894, ch. 546, be
sustained, there will henceforth be little, if anything, of this
constitutional limitation left in Maryland.

Section 5 of the bill of complaint also raises the consti-
tutional question of the delegation back to the people of
legislative powers.    This is a constitutional limitation on
legislative power generally recognized throughout the
American States.    *Cooley Const. Lim.*, p. 137 ; *Sutherland
on State Cons.*, sec. 67, and numerous cases cited.    In
the earlier cases the submission of an Act of the Legis-
lature to popular ratification was held void, as in conflict
with this constitutional principle, but the submission of
local and even general laws to popular ratification are now
generally held valid.    But there is one clear principle to
which by the uniform force of the authorities all such sub-
mitted laws must conform.    The Act submitted to popular
ratification must be a perfected law ; it must be " as an
emanation of the legislative will—perfect in all its parts."
The only question submitted to the people must be the *mere*
ratification of the legislative will as thus perfected, the pop-
ular vote being the mere contingency upon which the per-
fected law shall take effect.    *Blanding* v. *Burr*, 13 Cal.
357.    *Cincinnati R. R. Co.* v. *Commissioners*, 1 Ohio St. 77;
*Sutherland Stat. Cons.*, sec. 68.    This principle has been
clearly recognized in Maryland.    *Fell* v. *State*, 42 Md. 71.
It must be a fair submission, broad enough to ascertain the

actual popular will of all citizens interested in the matter. *Bradshaw* v. *Lankford*, 73 Md. 428. The Act of 1894, ch. 546, conflicts with both of the principles last above enumerated:    1. By the terms of the submission it is not a perfected law, but *confers on the people a discretion as to what the law shall be*.    2. By limiting the popular choice to La Plata, the place the people had twice rejected, and one other place selected by the admittedly biased framers of the bill, the question submitted was not broad enough to ascertain the actual popular will of the people interested. If such a submission of the question be sanctioned, it will henceforth be in the power of a biased local delegation to actually remove the county seat and submit to the choice of the people one favored place in competition with one other impossible location. The only fair way to submit such a question is to submit one place at a time, in competition with the old established county seat.

Sections 15 and 16 of the bill of complaint raise the question that the Act of 1894, ch. 546, is in violation of section 33 of Article 3 of the Constitution, in that it is a special law; and the Legislature is required to provide by general law, and not special laws, in all cases where a general law can be made applicable. In the State of Indiana, with constitutional limitations in this respect identical with our own, the Supreme Court of that State held, as early as 1854, that a law providing for the removal of the county seat of Clay County was a special law, in conflict with this provision of their Constitution, although not specially enumerated therein as such, and that the removal of county seats, being manifestly a subject of a general nature for which provision could be made by general law, it was the duty of the Legislature to provide therefor by a general law. *Thomas, &c.,* v. *Coms. of Clay County*, 5 Ind. 4.

*Bernard Carter* and *L. Allison Wilmer*, for the appellees.
The one subject of the Act of 1894, as described in its title, is the fixing of the location of the county seat, and

the body of the Act deals with this subject and no other. It deals with it by directing: 1st. That a vote shall be had on the question whether the county seat shall be located at La Plata or at Chapel Point(section 2); 2d. By directing that if it appears by the proclamation of the Clerk of the Circuit Court, that a majority of the votes cast have been cast *for locating* the county seat at La Plata, then, thenceforth La Plata shall be *the* county seat; and if a majority were for Chapel Point, it shall be the county seat; and 3d. It makes provision for the building of the jail and court-house, at whichever place was thus selected as the county seat.

Now, as there can be but *one* county seat, it follows that when the voters voted to locate it either at Chapel Point or La Plata, they necessarily voted that it should not be any longer located at Port Tobacco, and therefore voted on the subject of the Act described in the title, to-wit, the *location of the county seat.* This is all that need be said to show the Act is not in contravention of the said 29th section of Article 3 of the Constitution.

But, in fact, there is no ground for the contention that the title of the Act indicated that the Act would present an opportunity to the people to vote on the question whether the county seat should remain at Port Tobacco. The whole title taken together shows that the intention of the Legislature was that either La Plata or Chapel Point should be the county seat, because a portion of the subject of the Act, as described in the title, was to procure *sites* for the new buildings, whereas, if it was not designed, at all events to remove the county seat from Port Tobacco, there was no necessity to provide *sites* for the buildings, as these were already provided; and both a new court-house and a new jail were to be erected on these sites, whereas, there was already a jail in existence in Port Tobacco.

The right to contest an election is not a common law right, but is entirely dependent upon statute. The Constitution, section 47, Article 3, provides that the "Legislature shall make provisions for all cases of contested elec-

tions for any of the *officers* not herein provided for." Either
the Constitution or an Act of Assembly must provide
specially for the contest or no contest is allowable. Now
neither the Constitution nor any Act of Assembly makes
any provision for the contesting of an election of the kind
provided for by the Act of 1894, chapter 546, and that Act
makes no provision for a contest of the election; therefore
no such right exists. By the terms of the Act the summar-
ization of the return judges and the proclamation of the
clerk finally and conclusively determines the question of the
locating the new county seat of Charles. *Atty. Genl.* v.
*Board Supervisors Lake County*, 33 Michigan, 289. As
this Court has more than once said, in the execution of all
laws, trust must be reposed somewhere, and the Legislature
reposed the trust of the due execution of this local law in
the judges of election and the Clerk of the Circuit Court.
If any authority is wanting for what seems to us so plain
a proposition, it will be found in *Gwinn* v. *Groome*, 43d Md.
In that case the Constitution did provide for a contest in the
election for Attorney General, but the Legislature having neg-
lected to provide the necessary machinery, this Court held
that the returns by the judges of election was sufficient and
the Governor must issue the commission. It must also be
remembered that the contest was made in *Gwinn* v. *Groome*,
upon the ground of *fraud.* See also *Miles* v. *Bradford*, 22
Md. 170. There seems to be injected in the minds of the ap-
pellants, that because they allege irregularities or fraud in
the conduct of the election, &c., a Court of Equity has juris-
diction to inquire into and adjudicate their effect. This is
not so. If a Court of Equity could be invoked every time
there is an allegation of illegality in an election, there
would be an enormous burden laid upon that Court. It
has been tried before, but without success. *Hardesty* v.
*Taft*, 23 Md. 530; *McCrary on Elections*, 3rd ed. 351.

ROBINSON, C. J., delivered the opinion of the Court.

By the Act of 1894, chapter 546, the question whether

the county seat for Charles County should be located at
" Chapel Point " or La Plata was submitted to the voters of
that county.   At the special election held in pursuance of
this Act, the majority of the votes cast, as ascertained by
the return judges, were cast in favor of La Plata as the
county seat.   The Act further authorized the County Com-
missioners to issue county bonds not to exceed twenty thou-
sand dollars, for the purpose of building court-house and
ail at the new county seat.

   This bill is filed by certain tax-payers of said county to
restrain the County Commissioners from issuing these bonds.
Their claim to the interference of a Court of Equity is based
on two grounds.  .First. That the Act of 1894 is uncon-
stitutional, and not therefore a valid exercise of legislative
power.   Secondly. Because of the fraudulent manner in
which the special election was conducted, whereby the will
of the majority of the voters was not fairly and lawfully
ascertained.

   If the Act in question is unconstitutional, the Commis-
sioners, it is clear, have no lawful authority to issue the
bonds for the purposes set forth in the Act; and the com-
plainants, as tax-payers, have the right to ask the Court to
enjoin the Commissioners from issuing said bonds.   This
we decided in *Gill's case,* 31 Md. 375, and it is no longer
an open question.

   The Act, it is said, is unconstitutional because the subject
of the Act is not described in its title as required by the
Constitution, which declares that " Every law enacted by
the Legislature shall contain but one subject and that shall
be described in its title."   Sec. 29, Art. 3.   Now, what is
the subject-matter of this Act?   In the first place, it pro-
vides that the question whether the county seat of Charles
County shall be located at " Chapel Point " or La Plata,
shall be submitted to the voters of the county.   Then it
provides the mode and manner· in which the election shall
be conducted, and then the means by which the money
shall be raised for the erection of the necessary public build-

ings and for the sale of the present court-house and jail
lots and the buildings at Port Tobacco. So the whole mat-
ter with which the Act deals is the location of the county
seat, the erection of the public buildings at the county seat,
as located by a majority of the voters, and the sale of the
lots, materials, etc., at Port Tobacco, the then county seat.
And the question is whether this subject-matter with which
the Act deals, is properly described in the title. Now, what
is the title? It is "An Act to provide for the removal
of the county seat of Charles County from Port Tobacco
to La Plata or Chapel Point, if the legal and qualified
voters of said county shall so determine, and to provide
for the erection of a court-house and jail, at such place as
shall be so determined on and the procuring of a site or
sites for the same, and to authorize the County Commis-
sioners of said county to borrow money and issue bonds for
the payment therefor." At first blush it would seem at
least that the subject-matter of the Act was not only de-
scribed, but fully and fairly set forth in the title, that is to
say the location of the county seat, the erection of the pub-
lic buildings at the county seat as thus located, and the
means necessary for the payment of the cost of said build-
ings. But the title it is said provides for the removal of
the county seat from Port Tobacco to La Plata or Chapel
Point if the legal and qualified voters shall so determine,
whereas the question submitted by the Act itself, is whether
the county seat shall be located at La Plata or Chapel
Point. In other words, it does not in terms submit to the
voters the direct question whether the county seat shall be
removed from Port Tobacco. This is at best a very nice
distinction, and one which it is plain never occurred either
to the Legislature or to the voters to whom the question
was submitted. The Act does in terms provide that the
question whether the county seat shall be located at La
Plata or Chapel point shall be submitted to the voters of
the county. And then it provides that if a majority of the
votes cast shall be in favor of La Plata, then thenceforth

La Plata shall be the county seat, and if a majority shall be in favor of Chapel Point, then it shall be the county seat. And the Act further provides for the purchase of site or sites for the erection thereon of a court-house and jail at whichever place the county seat may be thus located. Now, as there can be but *one county seat*, it follows that when the voters cast their ballots for the location of the county seat at either La Plata or Chapel Point, they necessarily voted that it should not any longer be located at Port Tobacco. So by every fair rule of construction the act itself provides for the removal of the county seat from Port Tobacco to La Plata or Chapel Point, as a majority of the voters shall determine. And this being so, there is no force in objection that the subject of the Act is not described in the title. On the contrary the whole subject-matter of the Act, the location of the new county seat and the erection of the public buildings at the place thus located is set forth in the title. We have had occasion in so many cases heretofore to consider the object and purposes and mischiefs intended to be remedied by the clause of the Constitution now before us, that it is only necessary to refer to these cases in which the subject has been fully discussed.

And whilst full force and effect should be given to this clause, Courts ought to be careful not to embarrass and defeat legislation by refined and subtle distinctions not within the spirit of the clause itself or the mischiefs to be remedied by it. There is no variance whatever between the title and the Act itself by which any one could possibly have been misled. The destruction of the court-house at Port Tobacco by fire made, it seems, that place no longer desirable as the county seat; and the only question was whether the new county seat should be located at La Plata or Chapel Point. It was so dealt with by the Legislature, and so understood by the people of the county. And all this contention about the subject-matter of the Act not being described in the title to the Act, is a mere afterthought,

and was never heard of until after the result of the election was declared to be in favor of La Plata.

As to the objection that the Act is a special law, and within the prohibition of sec. 33, Art. 3 of the Constitution, which declares that " The General Assembly shall pass no special law for any case for which provision has been made by a general law," it is sufficient to say that no general law has been passed by the General Assembly providing for the removal or location of county seats. And there being no general law on the subject, a special law was absolutely necessary.

Nor is there any force in the objection that the Act of 1894 is a delegation of legislative power to the people. The question submitted to the voters of Charles County was in regard to the location of the county seat, and being a matter of merely local concern, it was a question which the *Legislature* had the right to submit to the determination of the people directly interested in it. In *Bradshaw* v. *Lankford*, 73 Md. 428, we said : "It seems to be well settled that questions of local concern whether for instance ·a county seat once located shall be removed elsewhere, or whether the county shall subscribe to a particular improvement, these and other like questions of local legislation may be referred to the voters of the county for decision."

The Act of 1894 being then a valid exercise of legislative power, the only remaining question is whether the complainants are entitled to an injunction restraining the County Commissioners from issuing county bonds as directed by the Act on the ground that the election held under it is null and void by reason of the fraudulent manner in which it was conducted. The bill charges that the election was conducted in a partizan manner—that a large majority of the judges and ballot clerks appointed were in favor of the location of the county seat at La Plata—that in four of the election districts the challangers appointed to represent the friends of Chapel Point were not allowed to witness the count of the ballots—that the count in these districts was not truly and correctly returned by the judges of election,

and that the election from the beginning to the end was not conducted according to law, and that a majority of the voters of the county did not vote to remove the county seat to La Plata. And the prayer is that the County Commissioners be restrained from issuing bonds for the purpose of building court-house and jail at La Plata, and that the election held under the Act of 1894 be declared null and void. And the question is whether a Court of Equity has jurisdiction in a proceeding of this kind to inquire into and determine the validity of an election of this kind? Provision is made by the Constitution for the contest of the election of certain officers ; and then it provides that " the Legislature shall make provisions for all cases of contested elections for any of the officers not herein provided for." And the Legislature after providing that all contested elections for Comptroller, Judges, Clerks of the Courts of law and Register of Wills shall be decided by the House of Delegates, further provides that *all cases of contested elections of any of the officers not provided for in the Constitution, or in the preceding section, shall be decided by the Judges of the several Courts, and by the Superior Court of Baltimore City.* A Court of Equity, it is clear, then, has no jurisdiction in this State to hear and determine a contest in regard to the election of officers. And it is equally clear that it has no jurisdiction by a proceeding in the nature of a writ of *quo warranto* to try the title to an office, for jurisdiction in such proceedings belongs to a Court of law. There is then no constitutional provision, nor any general law conferring jurisdiction on a Court of Equity to hear and determine an election contest of any kind, nor does the Act of 1894 make any provision for a contest of the special election to be held under that Act. And this being so we all agree that a Court of Equity has no jurisdiction to decide such a contest, even in a direct proceeding for that purpose, and *a fortiori* it can exercise no such jurisdiction in a collateral proceeding of this kind. For these reasons the decree below must be affirmed.

*Decree affirmed.*

(Decided January 9th, 1896.)