[Civil No. 3164.   Filed September 17, 1932.]

[14 Pac. (2d) 478.]

WILLIAM McRAE and LAURA M. McRAE, Husband and Wife, Appellants, v. LOIS GRUNOW MEMORIAL CLINIC, a Corporation, Appellee.

Mr. F. C. Struckmeyer, Mr. Herman Lewkowitz and Mr. George F. MacDonald, for Appellants.

Mr. H. S. McCluskey, Mr. Floyd M. Stahl and Mr. Luther P. Spalding, for Appellee.

ROSS, J.—This proceeding was instituted by the McRaes, husband and wife, to enjoin the defendant from violating certain restrictions imposed in a deed under which it obtained title. The court denied the injunction but awarded plaintiffs damages. Plaintiffs have appealed. Both parties are dissatisfied and have assigned errors.

In April, 1914, the owner of the piece of land hereinafter referred to as Hurley Heights Subdivided, an addition to the city of Phoenix, caused the same to be platted into blocks and lots and a map thereof to be filed in the office of the county recorder of Maricopa county. The subdivision is divided into blocks 5 and 6 facing lengthwise on McDowell and Coronado Roads between Seventh and Tenth Streets. There are six 100-foot lots in each block facing McDowell and twelve 50-foot lots in each block facing Coronado, or 36 lots all told.

The plaintiffs are the owners of lot 8 in block 6 facing Coronado, and defendant owns lots 16, 17 and 18 facing McDowell. Plaintiffs obtained title to their lot in March, 1927, and defendant to its lots on May 28, 1930. The titles of the plaintiffs and defendant and other purchasers of lots in Hurley Heights Subdivided are deraigned from the Phoenix Title & Trust Company acting as trustee for the owner. In the deed from Phoenix Title & Trust Company to its grantee, through whom the plaintiffs deraign title, were inserted the following conditions and restrictions:

"The grantor grants, sells and conveys said property subject to the following express conditions and

stipulations, as to the use and enjoyment thereof by grantee, his heirs and assigns: that said property shall be used for dwelling houses, boarding houses, and hotel purposes only; that no buildings other than dwelling houses, boarding houses or hotels, and the barns, garages and other outbuildings incident thereto shall be erected on said property; that the cost of any dwelling house, boarding house or hotel erected on said property shall be not less than $2,500.00; that the lines or walls of any dwelling house, boarding house or hotel, exclusive of porches, built on said property, shall be thirty feet from the front line of said property, and not less than ten feet from any side street line or way of said property; or within three feet from the side line of any inside lot, inclusive of porches; that no fence shall be placed nearer than forty feet from the front line of said property; that the barns, garages, and other outbuildings built upon said property shall not be built within one hundred feet of the front street line of said property nor within twenty feet of any side street or way line of said property; that all dwelling houses, boarding houses or hotels, built on said property shall face either north or south to correspond with the front property line; that said premises and no part thereof shall ever be used for vending, selling or dealing in vinous, malt or spirituous liquors, and no saloon, bar or house of ill-fame shall ever be allowed thereon; that no part of said premises shall ever be conveyed, transferred, let or demised to any person or persons of African, Mexican, Mongolian or Indian descent; that grantor herein shall insert substantially like covenants and conditions in all subsequent transfers of lots in said Hurley Heights Subdivided made by grantor; that should any of the covenants and conditions herein contained be held invalid or void, such invalidity or voidness of such covenant shall in no way affect the validity of the rest of this instrument or any valid covenant or condition herein contained; that all covenants, conditions and stipulations herein contained run with the land, and upon the breach of any one thereof the property shall revert to said grantor, its successors or

assigns; provided in such event any existing valid mortgage upon said premises shall remain a valid encumbrance thereupon; and provided, further, that the mortgagee or his successors in interest, whether by purchase or otherwise, shall be bound by the covenants, conditions and stipulations herein contained.''

In the deeds from the trust company to its grantees, through whom the defendant deraigns title, were inserted conditions and restrictions substantially the same as in plaintiffs' deed.

The defendant's immediate grantors were William C. Grunow and Valborg Grunow, his wife, residents of Cook county, Illinois. They purchased lots 16 and 17 from John L. and Nettie S. Irvin and received a deed therefor dated April 3, 1930, and lot 18 from Avis P. Little and S. D. Little, her husband, and received a deed therefor dated March 27, 1930.

All of the lots on Coronado Road have been sold (two to persons of Mexican descent) and improved for residence purposes. Four lots on McDowell Road are occupied by dwellings, one of which is the original farmhouse, and two of the lots on the corner of McDowell Road and Seventh Street are occupied by commercial houses, such as stores, confectioneries, service stations, etc. Counting these six lots together with three purchased by the defendant, only three lots in Hurley Heights Subdivided are unimproved and these face on McDowell Road.

Upon the filing of plaintiffs' complaint, July 10, 1930, the court issued a citation to defendant, returnable July 17th, to show cause why it should not be restrained from constructing or continuing with the construction of its building. Excavation for the foundation of building was begun about June 30th. No temporary restraining order was granted or issued. The defendant pushed the building to completion in December, 1930, and when the case came on for trial, in January, 1931, the building was occupied and being

used for the purpose for which it was constructed, to wit, a clinic or laboratory.

It appears from the evidence that William C. Grunow had decided to make Phoenix his winter home. He had become interested in medical charity and in the month of February, 1930, had decided to construct a monumental building in Phoenix, to be called the Lois Grunow Memorial Clinic, so that he would have something to engage his time while wintering in Phoenix. He conferred with W. O. Sweek, a local physician and surgeon to whom he made known his wishes and desires and to whom he entrusted, to a large extent, the carrying out of his wishes. He engaged Fitzhugh & Byron, local architects, to make a sketch showing the type of building proposed. He commissioned John L. Irvin & Company, realtors, to find a location and secure options thereon, with instructions that it should be located near a street-car line and one of the city hospitals and in a community or locality where the people would not object to such an institution, stating that he would not build in any locality "if anyone objected."

"He said he wanted everyone in the district to be thoroughly satisfied with the institution. He wanted no opposition from any source, and if there were any restrictions on any property, that he would require those restrictions to be removed; and whether the restrictions were valid or not, he would not want any opposition from anybody in the neighborhood, because he wanted everybody to love the institution, for the reason it was a memorial for his daughter."

Mr. Grunow gave Irvin $1,000 with which to obtain options upon a site suitable for his contemplated building. With this money options on lots 16, 17 and 18 were taken. As these lots were in a restricted district, in order to meet Mr. Grunow's stipulation that everybody should be satisfied or that no one should object to the location of the building in his

neighborhood, steps were immediately taken to secure the consent of the owners of the property in the district. Every owner of a lot in said district, except the plaintiffs, signed an agreement waiving the restrictions and consenting to the construction of defendant's building. The plaintiffs were seen and interviewed by John L. Irvin and H. S. McCluskey, to whom they expressed themselves as pleased with the location of the clinic, and while not signing a waiver said they would do so and gave assurance that they would not interfere with construction. On or about April 3, 1930, writing from Casa Grande, Arizona, plaintiff William McRae stated plaintiffs' position as follows:

"Mr. Wm. C. Grunow, Personal

"Chicago, Ill.

"Dear Sir:

"We own a resident property, with lot 50 x 140 feet, adjoining the location selected by you for the Medical Labratory (laboratory) you are so kindly giving to Phoenix. Our property joins on the North. We have had this property for sale, and we are obliged to dispose of it so that we can complete the purchase of some properties here.

"This property should be of advantage to the operation of the Medical Labratory (laboratory), and at least would be a good investment for the extra funds made available for the operation or maintenance of the institution.

"We feel that if it is possible to present this property for sale to the right party, and with your consent that the same would possibly be acquired in connection with the other ground. The location of this is Lot eight, Block six, Hurley Hights (Heights) Addition, being 929 East Coronado.

"It would be greatly appreciated by us if you would arrange to have this property purchased for the benefit or use of the Labratory (laboratory). We do not want to hold the price too high, nor take advantage of the situation, but would accept our cost,

$6,500.00, and can give possession by the 23rd of July, of this year.

"We have been asked by Mr. H. S. McClusky, Attorney, and by Mr. John L. Irvin, Realtor, to waive the building restrictions so as to permit the construction of the proposed Labratory (laboratory) on the adjoining property. We have not signed the waiver as yet, for we are dependent on renters, and we also prefer to sell rather than to hold this property. It is not our intention to hold out, but we do feel that the purchase of our property in connection with the other should have more consideration than has been given.

"Yours very truly,

"[Signed]   WM. McRAE."

It was stated at the argument that about the time this letter was received the options that had been taken on lots 16, 17 and 18 were about to expire. In view of the verbal assurances given to McCluskey and Irvin and the assurances in this letter, Dr. Sweek, under the advice of McCluskey, took up the options, paying therefor $30,500 out of moneys sent him by Mr. Grunow for that purpose. The actual outlay for the lots, building and furnishings was about $250,000.

The actual exchange of purchase price and deeds occurred about April 15, 1930, and not on the dates of deeds, that being when they were escrowed.

The property was accepted and paid for by Dr. Sweek as agent for Mr. Grunow upon the advice of the latter's attorney, Mr. H. S. McCluskey, that he might safely do so. It seems that McCluskey believed that the restrictions in the deeds were for the benefit of the grantor and its beneficiary and that no one else could complain of their violation. He also entertained the view that because of plaintiffs' attitude of acquiescence and encouragement they would later sign waiver or if they refused to do so that their conduct was tantamount to a waiver or estoppel.

One of the legal questions involved is whether the restrictions in the deeds from the original grantor were inserted just for the benefit of such grantor or for the benefit of any and every purchaser of a lot in the Hurley Heights Subdivided. We think the restrictive covenants as to the use of the real estate are a part of a general plan or scheme for the development of Hurley Heights Subdivided and for the benefit of all the lots included in the tract and may be enforced by the owner of any lot in such tract against the owner of any other lot. This seems to be the rule followed in most jurisdictions. 32 C. J. 204–207, §§ 317, 319, 320, 324; *Martin* v. *Holm,* 197 Cal. 733, 242 Pac. 718; *Ludgate* v. *Somerville,* 121 Or. 643, 54 A. L. R. 837, 256 Pac. 1043; *Abbott* v. *Steigman,* 263 Mass. 585, 161 N. E. 596; *Vaughn* v. *Lyon,* 122 Okl. 179, 252 Pac. 1088; 21 A. L. R. 1281, at page 1306, 33 A. L. R. 676, at page 677, and 60 A. L. R. 1223, at page 1228; *Hartman* v. *Wells,* 257 Ill. 167, Ann. Cas. 1914A 901, 100 N. E. 500; *Barnett* v. *Vaughan Institute,* 134 App. Div. 921, 119 N. Y. Supp. 45; *Walker* v. *Haslett,* 44 Cal. App. 394, 186 Pac. 622; *Walker* v. *McNulty,* 19 Misc. 701, 45 N. Y. Supp. 42; *Brandenburg* v. *Country Club Bldg. Corp.,* 332 Ill. 136, 163 N. E. 440. The restrictions here run with the land and were clearly intended to be for the benefit of each and every lot. They were inserted in all the deeds so that each purchaser took his lot charged with the benefits and burdens of the plan or scheme of improvement.

*Ainsworth* v. *Elder, ante,* p. 71, 9 Pac. (2d) 1007, and *Continental Oil Co.* v. *Fennemore,* 38 Ariz. 277, 299 Pac. 132, were actions to enjoin the construction of buildings not of the character permitted under the plan or scheme of improvement adopted for the district, and in both cases the relief prayed was granted. In neither of these cases was the purpose of the grantor to place restrictions on his grantees

questioned. The purpose and intent to do so were unequivocally manifest from the language employed in deeds. In the Ainsworth case the question was whether the improvement was one permitted under the plan, and in the Continental Oil case whether business had so invaded the restricted district as to convert it into business property. The question of the intent of the grantor to impose restrictions, according to a plan or scheme of improving the tract of land, upon all purchasers and their grantees and the character of the rights thereby secured were not involved and therefore were not discussed. That he could impose restrictions, and that each owner of a lot therein could insist that the restriction be observed, was taken for granted as a matter of course.

We think the plan or scheme of improvement in this case is manifest when in connection with the map thereof filed in the office of the county recorder the recitals in deeds are considered. The same, or substantially the same, restrictions were inserted in all deeds of lots made by the grantor. These restrictions were in the interests of each lot owner. He was advised and knew by the recitals in his deed and those of his predecessors that he, according to the plan, could construct only a residence, a boarding house, or a hotel and appurtenant buildings, and that every other owner of a lot in Hurley Heights Subdivided was subject to the same restrictions.

Mr. Grunow's local representatives, in adopting the view that the restrictions in deeds to lots in Hurley Heights Subdivided were for the benefit of the grantor only and not all owners of lots therein, did so inadvisedly and erroneously. Even granting that the rule stated and followed in *Werner* v. *Graham*, 181 Cal. 174, 183 Pac. 945, and like cases relied upon by defendant, is correct, the facts here do not bring this case within that rule, for here there is no doubt about

there being a plan or scheme of improvement, so drafted that every lot owner became bound thereby.

It follows from what we have said that the plaintiffs had the right to enforce by suit in equity the observance of the building restrictions upon lot owners in Hurley Heights Subdivided, unless they have by their laches or acquiescence or other conduct forfeited or waived said right or estopped themselves from asserting it against defendant. Waiver and estoppel are among the defenses pleaded by the defendant.

It is said the enforcement of building restrictions in a court of equity is not a matter of absolute right, but is governed by the same general rules which control equitable relief as to specific performance. 32 C. J. 207, § 321. It seems to be well settled that specific performance of a contract is discretionary with the court and that performance will not be decreed when it will result in great hardship and injustice to one party without consideration, gain, or utility to the other, or in a case where the public interest would be prejudiced thereby. *Conger* v. *New York, W. S. & B. R. Co.*, 120 N. Y. 29, 23 N. E. 983; *Pauley* v. *Hadlock*, 21 Ariz. 340, 188 Pac. 263; 58 C. J. 855, § 13.

In *Johnson* v. *Robertson*, 156 Iowa 64, Ann. Cas. 1915B 137, at page 145, 135 N. W. 585, the court said:

"It is true, of course, that the specific performance of such contracts like those relating to contracts affecting real estate in general rests largely in the sound discretion of the court, and if the defendant will be subject to great hardship, or the consequences would be inequitable, relief will be denied. . . .

"Of course the party complaining must not be guilty of laches, nor may he be in the position of having acquiesced in the breach."

See, also, *Union Trust & Realty Co.* v. *Best*, 160 Cal. 263, 116 Pac. 737.

This suit was not brought until some ten days after the work of excavating for foundation was begun, and for some reason it was not tried or pressed for trial until after the clinic was completed and occupied. When it was finally tried, preventive relief, the relief ordinarily sought and granted by injunction, was no longer possible. Nothing short of a mandatory decree compelling the defendant to tear down and remove its building or to convert it into a residence or a boarding house or a hotel, to conform with the restrictions, would afford relief to plaintiffs. Such enforcement of the restrictions, it is obvious, would subject the defendant to great expense and loss. It is quite evident that plaintiffs were trying to take advantage of the situation to compel the promoter of the clinic to buy their place. They allowed the movement to locate the clinic in Hurley Heights Subdivided to be carried on until actual work of excavating the foundation for the building was commenced before bringing this action. They wrote Mr. Grunow under date of April 3d: "We have not signed the waiver as yet. . . . It is not our intention to hold out." In other words, they said to him, in substance: "We want to sell you our place but whether you buy it or not we will not hold out against the improvement you contemplate making." Like representations and statements were made to John L. Irvin and H. S. McCluskey, who had undertaken and had actually secured the consent of the owners of the other thirty-five lots in Hurley Heights Subdivided to defendant's clinic being located therein. It was only after Grunow had bought the lots that plaintiffs assumed a fighting attitude. Theretofore they had been more or less acquiescent, and although they had not signed the waiver, they had assured Grunow and his agents that they would not stand in the way of the improvement. In its final analysis it looks very much as though the plaintiffs had conceived the idea

of openly encouraging Grunow and his agents to buy the lots and to locate the clinic in Hurley Heights Subdivided while secretly intending to enjoin its construction unless their lot was bought at their price. At least the evidence will justify such an inference and if such was their purpose we think the court was right in denying them injunctive relief.

We think it is up to plaintiffs, seeking equitable relief as they are, to show they did not bring on by their own conduct the situation they now complain of. They must themselves have clean hands. The record indicates that Mr. Grunow, through whose beneficence Phoenix was to acquire the Lois Grunow Memorial Clinic, was of another city and state and therefore largely in the hands of friends and acquaintances made in his winter visits to Phoenix. Plaintiffs, writing to him at his Chicago address a proposition to sell their lot "adjoining the location selected by you for the medical labratory (laboratory) you are so kindly giving Phoenix," recognize that Mr. Grunow's home was elsewhere, the eleemosynary character of the proposed institution, and that it was not for the profit or gain of its promoter. Under the circumstances, if the plaintiffs had any objection to the institution being located in Hurley Heights Subdivided, it seems to us they would have so stated instead of leading Mr. Grunow to believe that they were pleased with its location and would later sign a waiver.

Whether the facts present a technical estoppel or a technical waiver seems to us unimportant. The question is, Do they present a situation showing that it would be unfair, unjust and inequitable to grant plaintiffs relief against a situation brought on by their conduct? We have examined the whole record and are satisfied that to grant the relief would occasion very much greater hardship and loss than could possibly be suffered by requiring the plaintiffs to resort to their action for damages. We believe

under the facts and circumstances the court properly exercised its discretion in refusing the injunctive relief.

In *Bauby* v. *Krasow,* 107 Conn. 109, 57 A. L. R. 331, 139 Atl..508, a situation was presented somewhat similar to the one here and in upholding the trial court, in refusing injunctive relief, the appellate court stated the facts and its conclusion as follows:

"Where, however, there has been an innocent mistake or a *bona fide* claim of right on the part of the defendant or laches on the part of the plaintiff, or where the conduct of the defendant was not willful and inexcusable, and where the granting of the injunction would cause damage to the defendant greatly disproportionate to the injury of which plaintiff complains, and it appears that damages will adequately compensate the latter, in such cases it has been held that it would be inequitable to grant a mandatory injunction and the plaintiff has been remitted to his remedy by way of damages. 17 Hallsbury's Laws of England, 213; *Starkie* v. *Richmond,* 155 Mass. 188, 29 N. E. 770; *Lynch* v. *Union Inst. for Savings,* 159 Mass 306, 20 L. R. A. 842, 34 N. E. 364; *Methodist Episcopal Soc.* v. *Akers,* 167 Mass. 560, 46 N. E. 381; *Hunter* v. *Carroll,* 64 N. H. 572, 15 Atl. 17.

"The purchase of the lot by the defendant Annie Krasow was made in good faith, and not for the purpose of avoiding the restriction of which she had knowledge, but which she claimed was a personal covenant and not an appurtenance to the land of the plaintiff. She started the erection of a three-family house upon the lot under a claim of right. After the cellar was completed and a portion of the frame was up this action was brought. No temporary injunction was sought by the plaintiff and the defendant completed the house at a cost of about $16,000. The house does not affect the light, air, or vision of the plaintiff's house to any appreciable extent more than would a one-family house. Under all the circumstances of the case it seems to us that it would be inequitable to require the removal of defendant's house and that an adequate remedy for the plaintiff

would be an award of damages for the depreciation in the value of his property caused by the violation of the restrictive covenant."

The text in 32 Corpus Juris 215, § 334, concerning the use of mandatory injunctions in cases of this kind, reads as follows:

"Within the rule permitting the enforcement of a restrictive covenant as to the use of land, when buildings or structures have been erected in breach of covenant, their removal may be ordered, unless the right is barred by some conduct on the part of plaintiff such as laches, acquiescence, waiver, or estoppel, or a substantial breach of the building restrictions by him. However, the breach must be very clear to justify a mandatory injunction. The court will not ordinarily take into consideration the relative amount of inconvenience or injury to be suffered by the parties in case the injunction is granted or refused, except in cases where the damage caused by the breach is minute. On the other hand it has been said that a mandatory injunction to remove a building or structure will not be issued when it will operate inequitably and oppressively, or where there has been nothing more than a mere breach of a negative legal right which is not injurious or detrimental in any way to plaintiff's rights, or where the injury complained of is not serious or substantial and may be readily compensated in damages, while to restore things as they were before the acts complained of would subject the other party to great inconvenience and loss."

See, also, *Schwartz* v. *Holycross,* 83 Ind. App. 658, 149 N. E. 699.

Both parties complain of the judgment of $500 damages against the defendant. The defendant contends that the overwhelming weight of the evidence was that the value of plaintiffs' property was enhanced, rather than damaged, by the placing of clinic in Hurley Heights Subdivided. There were some five or six witnesses testified that plaintiffs' property would sell for more after the clinic was con-

structed than before. Only one witness, plaintiff William McRae, said plaintiffs' property was damaged. He said that if he were buying it for residence purposes he would consider its value reduced one-third or something like $2,000. Numerically the preponderance is with defendant, but the court was not bound by the greater number of witnesses. There was some evidence to support the verdict and judgment for $500 damages, and under our rule we will not disturb that verdict.

The plaintiffs claim such judgment should not have been rendered for the reason that there were no allegations in their complaint nor proof offered by them upon which the court could base a money judgment. The plaintiffs, besides praying for injunctive relief, asked "for such other and further relief as to the court may seem meet and proper." The value of plaintiffs' property both before and after the improvement was put in issue. Plaintiffs alleged its value as residence property would be damaged, depreciated, and lessened, and defendant that its value would be increased and enhanced and its owners benefited. Under the pleadings the question of damages was in issue and evidence was taken thereon. It is true the specific relief prayed was equitable while that granted was legal. It should be remembered that forms of action are abolished under our judicial system. They are civil actions and are to be stated without distinction between actions at law and in equity and also without distinction as to the nature of the relief demanded. Section 3746, Rev. Code 1928. And it is provided that judgments shall conform to the pleadings, the nature of the case proved, and the verdict, if any, and shall give all the relief either in law or equity to which a party may show himself entitled. Section 3834, Id. We think the rule is as stated in *McLennan* v. *Church,* 163 Wis. 411, 158 N. W. 73:

"It may be broadly stated thus: In case of an action having been commenced in good faith to obtain equitable relief, and it subsequently appearing that such relief cannot, or ought not to be, granted, but the facts disclosed by the evidence show that plaintiff has suffered a remediable wrong in the transaction forming the groundwork of the action, entitling him to be compensated by money damages, the court may, and where justice clearly requires it under the circumstances, should retain the cause and afford such relief, and make the same efficient by provisions for a recovery as in an ordinary legal action or as are appropriate to a judgment for equitable relief, as may be best suited to the circumstances of the particular case."

The question of damages and the amount thereof being one at law, under the Constitution either party might have demanded a jury trial. That was not done and no question of that kind was raised below nor presented on appeal. *McLennan* v. *Church, supra;* 21 C. J. 144, § 123.

We are satisfied that the trial court committed no error in refusing to grant the injunctive relief or in awarding damages to the plaintiffs.

The judgment is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.