192 P.2d 236

MORGAN v. BOARD OF SUP'RS et al.

No. 5019.

Supreme Court of Arizona.

April 5, 1948.

Harold J. Janson, of Phoenix, for appellant.

Francis J. Donofrio, County Atty., and Fred C. Struckmeyer, Jr., Deputy County Atty., both of Phoenix, for appellees.

John L. Sullivan, Atty. Gen., and William P. Mahoney, Jr., Asst. Atty. Gen., for amici curiæ.

UDALL, Justice.

This is an appeal by Milo Morgan (plaintiff-appellant) from a judgment dismissing his complaint for injunctive and other relief against the Maricopa County Board of Supervisors and the Board of Trustees of Washington School District No. 6. The defendants will be termed appellees.

At a regularly called election held in said district on May 14, 1947, the vote was 308 in favor of the issuance and sale of bonds in the sum of $164,000, and 187 "bonds no" votes were cast. Appellant, who was a qualified elector and a real property taxpayer residing in the district, brought this suit for himself and all others similarly situated, seeking to void the results of the bond election by restraining the issuance and sale of the bonds thus voted.

The assignments of error, which will be stated more in detail later, contend that the lower court disregarded the constitutional limit of bonded indebtedness for school purposes and also challenge its implied finding that the election was fairly conducted, particularly as to the exclusion from voting of ex-service men and widows who had claimed exemption from payment of taxes.

█ If the bonds in the instant case are issued and sold unquestionably the property rights of the appellant and other taxpayers similarly situated would be involved; hence, appellant had the right to bring an action seeking injunctive relief on the ground that the constitutional limitation of indebtedness was exceeded.

"The right of properly interested persons to have an illegal issuance, sale, or delivery of the bonds of a political subdivision enjoined is so well settled as to be beyond dispute, and, as a matter of fact, is tacitly recognized by the courts and various litigants as a mere matter of course in many hundreds of decisions. * * *" 43 Am.Jur., Public Securities & Obligations, section 335, page 538. See also 43 C.J.S., Injunctions, § 121.

The problem as to whether the actual debt limit of ten percent, as fixed by article 9, section 8, Constitution of Arizona, was here being exceeded hinges upon the answer to two questions: (a) can moneys in the district's bond sinking fund be treated as an asset in computing the net in indebtedness? (b) does the ten percent limit of indebtedness apply separately to each distinct political unit?

█ As to the first question, the authorities disclose practical unanimity in holding that in determining the indebtedness of a district, within the constitutional provision limiting indebtedness, a sinking fund reserved and pledged for the payment of existing bond obligations may be deducted in computing outstanding bonded indebtedness. City of Stamford v. Town of Stamford, 107 Conn. 596, 141 A. 891, 896; First National Bank v. City of Jackson, 199 Ky. 94, 250 S. W. 795; Kirk v. School Dist. No. 24, 108

Okl. 81, 234 P. 596. See also 44 C.J., Municipal Corporations, section 4056, page 1123; 38 Am.Jur., Municipal Corporations, section 481, page 160. In the case at bar the record shows that the deduction of the amount in the sinking fund brings the district's net indebtedness down to a few hundred dollars below the maximum fixed by the constitution; hence, the first question must be answered in the affirmative.

Appellant contends (though he offered no proof in support) that the appellee school district lies within the Glendale Union High School District, and that if its proportionate part (two-fifths) of the High School District bonded indebtedness were added to appellee school district's indebtedness it would far exceed the ten percent limit; in fact, he argues that it would be possible by computing the indebtedness in this manner to saddle onto an area twenty percent indebtedness rather than the limit fixed by the Constitution. Even admitting the facts relied upon by appellant to be true, there is no merit to this contention because the grade school and the high school are distinct political units and the constitutional limitation is held to apply separately to elementary school and high school districts even though they are wholly or partly coincident in territory. Board of Education v. Upham, 357 Ill. 263, 191 N.E. 876, 94 A.L.R. 813, see Ann. page 818; Wilson v. Board of Education of City of Huron, 12 S.D. 535, 81 N.W. 952; Ex parte City of Newport, 141 Ky. 329, 132 S.W. 580, 37 L.R.A.,N.S., 1034, Ann.Cas.1912C, 447.

The amended complaint further charged that the fairness, purity, and freedom of the bond election were materially interfered with by acts of coercion and intimidation on the part of the school trustees, the election board, and other officials of the district. Particularly, objection is made to the fact that prior to the election there was widely distributed to the electorate of the district, both through the mails and by sending copies home by students, a printed circular prescribing voters' qualifications which was addressed to Washington School Taxpayers, such statement being admittedly approved by the county attorney's office. One item on this circular read "If you are a veteran or widow and are tax exempt and have paid no real property tax you *can not vote.*" To carry out the spirit of this pronouncement and to see that only real property taxpayers voted, the election officials required every person applying for a ballot to fill out a certificate or questionnaire giving the description of his realty lying in the district or in lieu thereof to present a current receipt for taxes paid.

These are all matters that in reality comprise a contest of the bond election, and were we to follow the holdings of this court in two previous cases we would have no jurisdiction to consider the question thus raised. The first pronouncement on this matter appears in the case of Phoenix Wa-

138

ter Co. v. Common Council, 1906, 9 Ariz. 430, 84 P. 1095, 1096, viz.:

" * * * Moreover, the election having been held, in compliance with the law, and the return thereof, lawful on its face, showing that those supporting the issue of the bonds had prevailed by the lawful majority, this return cannot collaterally be attacked for errors or frauds alleged to have occurred in the conduct of the election or in the registration preceding it. Carroll County v. Smith, 111 U.S. 560, 565, 4 S.Ct. 539, 28 L.Ed. 517; Hamilton v. Carroll, 82 Md. 326, 33 A. 648."

In that case a demurrer was sustained to a complaint wherein the plaintiff sought to restrain the City of Phoenix from issuing bonds for construction of a water system. The grounds relied upon for the injunctive relief were irregularities in the conduct of the election similar to those charged in the instant case. Later in Alexander v. Phillips, 1927, 31 Ariz. 503, 254 P. 1056, 52 A. L.R. 244, which had a similar factual situation to the case now under consideration, the taxpayers in the Phoenix Union High School District had voted bonds with which to build a stadium. A suit seeking injunctive relief was brought in which there was challenged the legality of votes cast by persons who it was claimed were not bona fide taxpayers. It was held that this was a collateral attack upon the validity of a school bond election, and the court refused to consider such matters.

A third Arizona case is Howard v. Luke, 1917, 18 Ariz. 563, 164 P. 439, wherein resident taxpayers brought an action solely against the Board of Supervisors of Maricopa County to contest a school bond election and to restrain the issuance and sale of the bonds so voted. The school district, the real party in interest, was not made a party to the suit; hence, this court properly held that it was a collateral attack on the election and refused to determine the matter of alleged irregularities occurring in the election.

In analyzing the two cases cited in the quotation from Phoenix Water Co. v. Common Council, supra, which were the basic cases relied upon, we find in Carroll County v. Smith, supra, an action at law to recover certain overdue interest upon municipal bonds theretofore issued. One of the defenses was infirmities in the election authorizing the issue. The Supreme Court of the United States pointed out that this was a collateral attack upon the election inasmuch as it was instituted long after the canvass of election returns and was not brought as a contest in a direct proceeding instituted for that purpose. The other case there cited, Hamilton v. Carroll, supra, was brought to restrain the issuance of county court house bonds, and it was further contended that the special election was conducted in a fraudulent manner in that the will of the majority of the voters was not fairly and lawfully ascertained. This was de-

clared by the Maryland Supreme Court to be a collateral attack primarily for the reason that the action seeking injunctive relief was brought on the equity and not the law side of the court, and that a court of equity, as such, had no jurisdiction to hear and determine an election contest.

The rulings in the Phoenix Water Co. and Alexander cases, supra, as to this being a collateral attack, represent the minority rule; in fact Arizona stands practically alone on this point. See 43 Am.Jur., Public Securities and Obligations, section 78, note 17, page 335; 56 C.J., Schools & School Districts, section 730, note 32, pages 616, 617. Hence irrespective of the basis for those holdings we now hold the instant suit to be a direct and not a collateral attack on the election. Under the statutes, the call, notice, election, canvass, and the issuance of the bonds was a continuing series of acts, each dependent upon those preceding it for validity; it is in fact one transaction made up of the several acts. This suit was timely brought against all of the parties in interest, even before the canvass of the election returns was made, seeking to void the result of the bond election by restraining the issuance and sale of the bonds. The sharp distinction formerly existing between forms of action is abolished under our judicial system. Sections 21-202 and 21-1219, A.C.A.1939; McRae v. Lois Grunow Memorial Clinic, 40 Ariz. 496, 14 P.2d 478. Furthermore, where equity has acquired jurisdiction for one purpose, it will retain jurisdiction to final adjustment of all differences between parties arising from cause of action presented. Vargas v. Superior Court of Apache County, 60 Ariz. 395, 138 P.2d 287.

What we believe to be the correct rule to follow in a situation of the kind we are now confronted with is stated in the case of Village of Morgan Park v. City of Chicago, 255 Ill. 190, 99 N.E. 388, 389:

"* * * While a court of equity will not take jurisdiction merely to determine the legality of an election, it will exercise its jurisdiction to protect property rights from unlawful interference, *although the determination of the question whether the interference is unlawful may depend upon the question whether an election was legal. * * *"* (Emphasis supplied.)

Having concluded that the trial court had jurisdiction to consider matters having to do with the conduct of the election, we now consider the fairness of the election and whether a widow or an honorably discharged soldier who by article 9, section 2, Arizona Constitution, is exempt from payment of taxes to the extent therein provided, and who has claimed such exemption and has paid no taxes during the current year, is entitled to vote at a bond election. The latter is governed by article 7, section 13 of the Arizona Constitution, which reads:

"Questions upon bond issues or special assessments shall be submitted to the vote

of *real property taxpayers,* who shall also in all respects be qualified electors of this state, and of the political subdivision thereof affected by such question." (Emphasis supplied.)

■ The presumption is in general that provisions of state constitutions are self-executing. 11 Am.Jur., Constitutional Law, section 72, page 689; 16 C.J.S., Constitutional Law, § 48; Southeastern Pipe Line Co. v. Garrett, 192 Ga. 817, 16 S.E.2d 753; Downs v. City of Birmingham, 240 Ala. 177, 198 So. 231; Rose v. State, Cal.Sup., 105 P.2d 302, 307, affirmed on rehearing 19 Cal. 2d 713, 123 P.2d 505.

The reason for invoking this general presumption is well stated in the following quotation from Rose v. State, Cal.Sup. 105 P. 2d 302, 308, viz.:

"The general presumption of law is that all constitutional provisions are self-executing, and are to be interpreted as such, rather than requiring further legislation, for the reason that, unless such were done, it would be in the power of the Legislature to practically nullify a fundamental of legislation. * * * (Cases cited.) "

Particularly is it true that constitutional provisions prescribing qualifications of electors are self-executing. 16 C.J.S., Constitutional Law, § 53, p. 108; Frost v. State, 153 Ala. 654, 45 So. 203; Foster v. Mayor and Council of College Park, 155 Ga. 174, 117 S.E. 84; Brown v. City of of Atlanta, 152 Ga. 283, 109 S.E. 666.

■■ Hence, article 7, section 13, being self-executing and mandatory, obligates every public official, including members of school district election boards, to enforce its provisions so as to effectuate its purpose. It is the duty of an election board to see that all who are justly entitled to vote are permitted to do so, and those not entitled to this privilege are prevented from exercising the right. Certainly the members of the election board need not stand impotently aside waiting, perhaps in vain, for a challenger, while unqualified persons vote.

■ There is no means set up by the legislature to advise the election board who are real property taxpayers, i. e., no one is required to prepare or certify a poll list of taxpayers residing in the district. The board is therefore cast upon its own resources. It was obligated to determine if the person seeking to cast a ballot did in fact possess the constitutional qualifications. We believe the action of the board requiring each person, before voting, to certify that he was a real property taxpayer, or to present a current tax receipt, was not an unreasonable requirement but rather conformed with the spirit of the general election laws relative to the registration of voters. As a matter of fact, chapter 24, Session Laws of 1925, contained a provision that electors at a school bond election be required to present a tax receipt showing payment of taxes or an assessment notice before being permitted to vote. In the 1928 codification of the Revised Stat-

utes of Arizona this provision was omitted. The statutes (section 10-604, A.C.A.1939) provide that in bond elections "The election *shall* conform with the general election laws of the state". (Emphasis supplied.) The word "conform" as there used means "to bring into harmony or agreement". It does not mean identical. Webster's New International Dictionary, 2d Ed. (unabridged); Friend v. Hamill, 34 Md. 298; Finch v. McVean, 6 Cal.App. 272, 91 P. 1019; Mielcarek v. Riske, 74 N.D. 202, 21 N.W.2d 218.

Appellant urges that to deny the right of widows and veterans who have claimed exemption from taxation and paid no taxes to vote at a school bond election is depriving them of some of their civil rights. As to this contention we think it pertinent to quote from 29 C.J.S., Elections, § 2:

"The right to vote is a political right or privilege, or civil right, to be given or withheld at the exercise of the law-making power of the sovereignty. * * *

"The right to vote is not a natural, inherent, or inalienable right, but a franchise dependent on law, by which it must be conferred to permit its exercise. It is not a necessary incident of citizenship, * * *. It is not included among the rights of property or of person."

See also 47 Am.Jur., Schools, section 11, page 304; 56 C.J., Schools & School Districts, section 716, page 604. Appellant advances the proposition of law that the stat-us of such a person as a voter in a bond election is not changed by the fact that he has exercised a constitutional privilege and right in claiming exemption from taxation.

In further support of his position appellant cites two decisions of this court. The first, City of Phoenix v. State, 60 Ariz. 369, 137 P.2d 783, 786, 146 A.L.R. 1255, involved the right of widows and veterans as *property owners* to sign a petition seeking annexation to the City of Phoenix. We upheld their right to sign the petitions as the fact that they may have claimed exemption from taxation could in nowise affect their status as property owners. The statement principally relied upon that " * * * widows, and soldiers must be treated as a class in determining their right to sign, and since some of them have only a partial exemption, others none at all, we think they may all sign", was purely obiter dictum. The other Arizona case is Evans v. Hallas, 64 Ariz. 142, 167 P.2d 94, 98, where the question involved was whether the claiming of exemption from taxation constituted a payment of the tax sufficient to satisfy the requirement of the statute that the tax must be paid before an action could be maintained to void a wrongful levy, assessment, or collection. In holding that such an action could be brought by a widow exempt from taxation, we used this language:

" * * * Likewise, when a widow or other person exempt appears before the official and makes the proper proof, this is

equivalent to the payment of the tax since it satisfies the statutory record lien which would otherwise be shown. * * * "

It will be noted that in stating the claiming of the exemption was "equivalent" to the payment (and in another place the word "tantamount" was used) we did not say that such constituted an actual payment. Things may be equivalent and still not be the same. Necessarily, this case must be judged in the light of the facts applicable hereto in determining whether here likewise the claiming of the exemption is equivalent to the payment. We do not believe the holding in this case is controlling or even conflicting with our view that only those who regularly pay taxes on real property can vote at bond elections.

Appellant relies upon such cases from other jurisdictions as Lersch v. Board of Public Instruction, 121 Fla. 621, 164 So. 281, where the constitutional qualification of electors was "a freeholder", or in Re Opinion to the Governor, 49 R.I. 296, 142 A. 372, 373, where "ownership of real estate" was the essential qualification. Such cases are clearly distinguishable from the case at bar where the test applied is "real property taxpayers".

We believe the following quotation from the Louisiana Supreme Court construing the term "property taxpayer" is more nearly applicable to our problem.

"But the majority of the court think otherwise, being of the opinion that by the term 'property taxpayer,' *the Constitution means a person who is such at the moment he or she offers to vote, and is such not ostensibly merely or, in other words, according to the assessment roll, but in reality;* that in the intendment of the Constitution *those only shall vote who are to pay the tax, who would be voting the tax upon themselves, and not upon others;* those only who are really owners of the property at the time it is voted." (Emphasis supplied.) Law v. Village of Marthaville, La.App., 195 So. 83. 85.

A taxpayer is defined by Webster's New International Dictionary, 2d Ed., Unabridged, as "one who pays a tax". Black's Law Dictionary, 3d Ed., gives this definition: "Taxpayer.—A person chargeable with a tax; one from whom government demands a pecuniary contribution towards its support". The Supreme Court of Montana in the case of State v. Moulton, 57 Mont. 414, 189 P. 59, 61, said:

" 'A taxpayer' is one who owns property within the municipality, and who pays a tax, or is subject to and liable for a tax."

The following definition "A taxpayer is a person owning property in the state, subject to taxation, and on which he regularly pays taxes" is cited with approval in many jurisdictions. See City of Pocatello v. Murray, 23 Idaho 447, 130 P. 383, Ann.Cas.1914 C, 1050; Castilo v. State Highway Commission, 312 Mo. 244, 279 S.W. 673; Lasityr v. City of Olympia, 61 Wash. 651, 112 P.

752. Certainly one who is wholly exempt from taxation and actually pays no taxes, as in the instant case, cannot fairly be said to be a "taxpayer" and so qualify under our constitutional provision.

In the case of Hicks v. Krigbaum, 13 Ariz. 237, 108 P. 482, 485, we construed the phrase "taxpayers of the district" as follows:

"* * * We are of the opinion, * * * that both the legislative intent and a reasonable construction require us to read the phrase to mean *those who pay taxes upon property within the school district.*" (Emphasis supplied.)

■ Our duty is to interpret the Constitution and laws as they have been written. The people in amending their Constitution have plainly said that the only persons entitled to vote at a bond election are "real property taxpayers". Who then comes within this classification? We construe it to mean a person subject to taxation on realty and regularly paying taxes thereon. We do not believe it was the intention of the framers of the Constitution to permit those who did not bear the "burden of taxation" to be heard on the question of whether a bonded indebtedness should be incurred. City of Phoenix v. State, ex rel. Harless, 58 Ariz. 8, 117 P.2d 87, 88. Had they so intended the phrase "submitted to the vote of real property owners" would doubtless have been used. In effect appellant is here contending that the two words "owners" and "taxpayers" are synonymous.

This is a palpable distortion of the clear expression of the will of the people of this state when in the year 1930 they amended this provision (article 7, section 13) of the Constitution.

■ Upon another ground the appellant has wholly failed to carry the burden of proof necessary to void this election. The rule is succinctly stated in 29 C.J.S., Elections, § 274:

"Legality of votes. Where an election is contested on the ground of illegal voting, the contestant has the burden of showing that sufficient illegal votes were cast to change the result, and of showing for whom or for what they were cast. Where the election is contested on the ground that the election officers erroneously rejected votes, the burden is on the contestant to show that such erroneous ruling materially affected the result. * * *"

■ The evidence wholly failed to show any appreciable number of qualified voters excluded or any act of intimidation or coercion on the part of any of the school district officials or election board, nor was there any evidence to support even an inference that the election was "fraudulent" or "rigged". The learned trial court properly found against the appellant on these issues.

The qualified electorate of the district having determined by their vote in a free and equal election that district bonds should issue in the aggregate sum of $164,000, with

the proceeds of which the cost of its expansion program might be carried forward to meet the needs of its constantly increasing school population, we find no justification for voiding the election or restraining the issuance or sale of the bonds.

Judgment affirmed.

STANFORD, C. J., and LA PRADE, J., concurring.