773 P.2d 233

**Geneva S. CLAY; Connie M. Oliver; and Brooke Andrews; qualified electors of the Town of Gilbert, Arizona, Plaintiffs/Appellants,**

v.

**TOWN OF GILBERT, Defendant/Appellee.**

No. 1 CA–CV 88–097.

Court of Appeals of Arizona, Division 1, Department D.

Feb. 2, 1989.

Review Denied June 6, 1989.

Snell & Wilmer by Lonnie J. Williams and Jeffrey Messing, Phoenix, for plaintiffs/appellants.

Martinez & Curtis, P.C. by Jay M. Martinez, William P. Sullivan, and Susan D. Goodwin, Phoenix, for defendant/appellee.

## OPINION

CORCORAN, Judge.

Plaintiffs/Appellants (contestants), as qualified electors of the Town of Gilbert, appeal from the trial court's judgment confirming the results of an election. This court has jurisdiction pursuant to A.R.S. §§ 12–120.21 and –2101. We affirm.

### Facts

On August 4, 1987, the Gilbert Town Council adopted Resolution 836, calling for a special election to be held on September 15, 1987, to place two questions before the qualified electors of the Town: (1) whether the town should acquire the electricity distribution system owned by Arizona Public Service Company, which provided service to a portion of the Town; and (2) whether the Town should issue revenue bonds to finance the acquisition and operation of the system.

As authorized by A.R.S. § 16–172, the Town contracted with Maricopa County for the county recorder's office to provide voter registration lists for the election. The lists erroneously contained names of persons who resided in so-called "county islands"—unincorporated portions of Maricopa County totally surrounded by the Town of Gilbert—and who thus were ineligible to vote in the election.

At the election, Question 1—the acquisition issue—passed by a vote of 1,113 to 1,089, a difference of 24 votes. Question 2—the bond issue—passed by a vote of 1,054 to 1,031, a difference of 23 votes.

In their original complaint contesting the election, contestants sought a temporary restraining order, preliminary injunction, and permanent injunction to prevent the Town from receiving the votes, and announcing or certifying the results of the election. The trial court denied contestants' application, and the Town proceeded to certify the election results. Contestants then filed an Amended Verified Complaint/Statement of Contest (complaint). The complaint essentially alleged that illegal votes and misconduct by Town officials materially affected the outcome of the election, requiring its invalidation. The trial court found in the Town's favor and confirmed the election results. This appeal followed.

### Issues

Contestants raise three issues on appeal: 1. Whether the trial court erred in requiring contestants to bear the burden of proving how ineligible voters had cast their ballots; 2. Whether the trial court erred in requiring contestants to show that the Town's failure to publish a publicity pamphlet affected the election results; and 3. Whether the trial court erred in permitting non-taxpayers of the Town to vote on whether the Town should acquire the electricity distribution system.

In resolving these issues, we were assisted greatly by the trial court's extensive findings of fact and review of authorities.

### 1. Ineligible Voters

Contestants alleged in Count 1 of their complaint that a number of voters were

**338**

ineligible because they were not residents of the Town, and that Town officials were guilty of knowing and intentional misconduct by allowing them to vote.

We have previously stated the following general rule:

> Where an election is contested on the grounds of illegal voting, the contestant has the burden of showing that sufficient illegal votes were cast to change the result, and of showing for whom or for what they were cast.

*Moore v. City of Page*, 148 Ariz. 151, 156, 713 P.2d 813, 818 (App.1986), quoting 29 C.J.S. *Elections* § 274, at 739 (1962). *See also Morgan v. Board of Supervisors*, 67 Ariz. 133, 143, 192 P.2d 236, 243 (1948); *Millet v. Board of Supervisors*, 6 Ariz. App. 16, 19, 429 P.2d 508, 511 (1967).

■ At trial, the Town stipulated that 27 people who were non-residents but whose names appeared on the voter registration lists had actually voted in the election. Question 1 passed by a margin of 24 votes and Question 2 by a margin of 23 votes. Thus, the trial court correctly held that contestants had met "their burden of proof in showing that a sufficient number of illegal votes which *might* change the result of the election were cast." The trial court held that contestants had failed to satisfy the second part of their burden of proof, however, in that they had "failed to prove that these votes materially affected the result, i.e., that the result would have been different if the illegal votes were not counted." The trial court also found that Town officials were not guilty of misconduct.

Contestants argue that they satisfied their burden of proof by establishing that a sufficient number of illegal votes were cast to change the result of the election. They contend that the trial court incorrectly required them to show that the illegal votes cast *actually* changed the election results because that burden necessarily involved forcing the ineligible voters to disclose how they voted.

Contestants also point out that, in this particular election, verifying how any of the votes were cast would be impossible, even if the ineligible voters could be forced to testify how they voted. The balloting was done by use of "punch cards." The punches for Question 1 were numbered 13 for a "yes" vote and 14 for a "no" vote; the punches for Question 2 were numbered 50 for "yes" and 51 for "no." The manual inspection of the ballots, performed pursuant to A.R.S. § 16–677 at contestants' request, revealed that on Question 1, 17 ballots had no hole punches in either number 13 or 14, 5 ballots had an incorrect hole punched, and 2 ballots had hole punches in both numbers 13 and 14. On Question 2, 138 ballots had no hole punches in either numbers 50 or 51, and 2 ballots had an incorrect hole punched. Thus, some voters who may have *intended* to vote "yes" or "no" on the two ballot questions did not *actually* do so. Therefore, even the testimony of the ineligible voters would not clearly establish how they *actually* voted on these issues, but would merely indicate how they *intended* to vote, and thus would not establish that the illegal votes actually changed the result of the election.

■ The Arizona Supreme Court has enunciated a workable rule for deducting illegal votes from otherwise valid election results when it is impossible to determine from the evidence for whom the ineligible voters actually voted:

> [I]t does not follow that such illegal votes must necessarily be counted in making up the true result because it cannot be ascertained for whom they were cast. In purging the polls of illegal votes, the general rule is that, unless it can be shown for which candidate they were cast, they are to be deducted from the whole vote of the election division, and not from the candidate having the largest number. Of course, in the application of this rule such illegal votes would be deducted proportionately from both candidates, according to the entire vote returned for each.
>
> . . . .
>
> To attempt to cast the burden upon either candidate to show for which particular candidate the illegal votes were cast would in most cases be impractical, ex-

ceedingly expensive, and would result in interminable delay and uncertainty.

*Grounds v. Lawe,* 67 Ariz. 176, 183–85, 193 P.2d 447, 451–53 (1948).

We believe the *Grounds* rule of proportional deduction of the illegal votes appropriately applies here, where determining how the illegal votes were cast would be impossible even if the ineligible voters testified. The Town clearly argued this approach before the trial court, which considered the *Grounds* rule in determining that contestants had not met their burden of showing that the illegal votes actually changed the election results.

█ The record indicates that all 27 ineligible voters lived in District 1. Contestants presented no evidence to the trial court of how these 27 ineligible voters cast their ballots. Accordingly, we must deduct the illegal votes in proportion to the number of votes cast for and against each question in District 1.

The Certificate of Results of Elections, recorded in the Maricopa County Recorder's Office, indicates that, in District 1, the "yes" and "no" votes on Question 1 were proportioned 50.6% and 49.4%, respectively; on Question 2, the "yes" and "no" votes were proportioned 50.1% and 49.9%, respectively.[1] Thus, under the *Grounds* rule, the 27 illegal votes should be proportionately

deducted as 14 less "yes" votes and 13 less "no" votes on each question in District 1. With the illegal votes deducted, the result of the election on each question remains the same; therefore, contestants did not meet their burden of proof of showing that the illegal votes actually changed the election results.[2] Thus, the trial court correctly ruled in the Town's favor on this issue.

### 2. Publicity Pamphlet

The complaint also alleged that Town officials "knowingly and intentionally failed to print a publicity pamphlet containing the arguments for and against the proposals as required by A.R.S. § 19–123." The trial court held that a publicity pamphlet should have been prepared and distributed, and found that the Town did not do so. However, the trial court refused to set aside the election because contestants failed to show that failure to issue a publicity pamphlet affected the election result.

█ In its brief, the Town argues that a publicity pamphlet was not required. Contestants contend that the Town abandoned that argument by not appealing the trial court's holding on that issue. We hold that a cross-appeal on this issue was not necessary.

The general rule regarding cross-appeals was given by our supreme court in *Marico-*

---

1. The certified election results were as follows:

| Polling Place | Yes | No |
| --- | --- | --- |
| QUESTION 1: Gilbert Elementary School (Dist. 1) | 575 | 561 |
| Patterson Elementary School (Dist. 2) | 538 | 528 |
| Totals | 1,113 | 1,089 |
| QUESTION 2: Gilbert Elementary School (Dist. 1) | 553 | 529 |
| Patterson Elementary School (Dist. 2) | 501 | 502 |
| Totals | 1,054 | 1,031 |

---

2. We note that, although proportionate reduction of the illegal votes in a single precinct did not make a difference in the outcome of the overall election results in this case, such a method potentially could change the outcome in an election where the distribution of votes cast in the precinct in which the illegality occurred was substantially different from the proportion of votes cast in the overall election. Indeed, the supreme court pointed this out in *Grounds:*

> Where the candidacy is for a public office in connection with an area larger than the election district where the illegal votes are cast

and with respect to which the election district contributes but a portion of the entire vote, it will be seen that if the distribution as between the candidates of votes in the election district is not in the same ratio as the distribution of the entire vote of the larger area, different candidates may be declared elected according to whether the illegality is ignored or the votes proportionately deducted according to the vote of the election district.

67 Ariz. at 184, 193 P.2d at 452.

*pa County v. Corporation Commission,* 79 Ariz. 307, 289 P.2d 183 (1955):

[I]f appellee in its brief seeks only to support or defend and uphold the judgment of the lower court from which the opposing party appeals, a cross-appeal is not necessary.... If, however, it is sought by such cross-assignments to attack said judgment with a view either of "enlarging his own rights thereunder or of lessening the rights of his adversary" he must cross-appeal by conforming with the rules of court by giving notice of appeal.

79 Ariz. at 310, 289 P.2d at 185, quoting *United States v. American Ry. Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087, 1093 (1924).

The trial court's judgment on the publicity pamphlet issue was ultimately in the Town's favor. By arguing in its brief that a publicity pamphlet was not required, the Town is not seeking to enlarge its rights or diminish those of contestants, but is merely seeking to uphold the judgment of the court, albeit on a different ground. *See Aegerter v. Duncan,* 7 Ariz.App. 239, 437 P.2d 991 (1968). We therefore conclude that the Town properly raised this issue in its brief as a cross-assignment of error, rather than as a cross-appeal.

Regarding the publicity pamphlet, A.R.S. § 19–123(A) provides:

When the secretary of state is ordered by the legislature, or by petition under the initiative and referendum provisions of the constitution, to submit to the people a measure or proposed amendment to the constitution, he shall cause to be printed, at the expense of the state, ... a publicity pamphlet....

This provision is made applicable to cities and towns within the state by A.R.S. § 19–141(A):

In cities and towns which do not provide by ordinance or charter for the manner of exercising the initiative and referendum powers reserved by the Constitution to the people thereof, the provisions of this chapter shall apply to the legislation of such municipalities, and the duties required of the secretary of state as to

state legislation shall be performed in connection with such legislation by the city or town clerk, or person performing the duties as such.... [T]he printing and binding of measures and arguments shall be paid for by the city or town in like manner as payment is provided for by the state with respect to state legislation. The printing shall be done in the same manner as other municipal printing is done. Distribution of pamphlets shall be made to every voter in the city, so far as possible, by the city or town clerk, either by mail or carrier, not less than eight days before the election at which the measures are to be voted upon.

The Town correctly contends that A.R.S. §§ 19–123 and –141 apply only to initiatives and referenda. Our constitution reserves the referendum power "to the qualified electors of every incorporated city, town, and county." Ariz. Const. art. 4, pt. 1, § 1(8). Unlike the state legislature, local legislative bodies have no authority to *voluntarily* refer matters to the electorate. *City of Scottsdale v. Superior Court,* 103 Ariz. 204, 206, 439 P.2d 290, 292 (1968). The Town thus contends that submission of Questions 1 and 2 to the qualified voters of the Town could not have been a referendum, and so compliance with § 19–141 was unnecessary. We agree.

A.R.S. § 9–514 provides that before the Town could acquire the electricity distribution system, the acquisition

shall be authorized by the affirmative vote of a majority of the qualified electors who are taxpayers of the municipal corporation voting at a general or special municipal election duly called and held for the purpose of voting upon the question.

Regarding Question 2—the bond issue—A.R.S. § 9–523 provides:

Questions on bond issues under this article shall be submitted to the qualified electors of the municipality. No bonds shall be issued without the assent of a majority of the qualified electors voting at an election held for that purpose as provided in this article.

Thus, the Town was statutorily required to submit Questions 1 and 2 to its qualified voters. The election did not result from a proposal by 10% of the Town's voters, as set forth in Ariz. Const. art. 4, pt. 1, § 1(8).

We conclude that the trial court erred in holding that the election was a "referendum" election and that a publicity pamphlet was required. Thus, the Town's failure to provide a publicity pamphlet does not provide any ground by which contestants may invalidate the election.

3. Constitutionality of A.R.S. § 9-514

Contestants' final issue is that the trial court erred in holding that non-taxpayers, who were otherwise qualified, could vote on Question 1—the acquisition issue. A.R.S. § 9-514 provides that only "qualified electors who are taxpayers of the municipal corporation" are authorized to vote on that question.[3] The uncontradicted evidence presented at trial established that the Town did not prevent non-taxpayers from voting on Question 1.

The trial court held that § 9-514 should not be construed to require that otherwise qualified voters also be taxpayers, relying on *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970). In *Kolodziejski*, the United States Supreme Court held unconstitutional former A.R.S. § 9-523, which required voters in a city bond election to be real property taxpayers of the city. The Court reasoned:

> The differences between the interests of property owners and the interests of non-property owners are not sufficiently substantial to justify excluding the latter from the franchise.

399 U.S. at 209, 90 S.Ct. at 1994. As a result of *Kolodziejski*, our state legislature amended § 9-523 to delete the requirement that voters be real property taxpayers. *See* Laws 1970, ch. 55, § 1. No amendment was made, however, to A.R.S. § 9-514, which, on its face, limits the franchise to taxpayers.

We agree with the trial court that, on the acquisition issue, "all citizens of the governmental unit (the Town) are affected and have an interest in issues such as these without regard to whether they are property owners/taxpayers or not." The acquisition and operation of the electricity distribution system by the Town would affect all Town residents who receive electricity from the system, whether or not those residents are taxpayers. In a similar context, the United States Supreme Court commented, "property owners [as well as taxpayers] are not alone in feeling the impact of bad utility service or high rates, or in reaping the benefits of good service and low rates." *Cipriano v. City of Houma*, 395 U.S. 701, 705, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647, 651 (1969).

In *Kolodziejski*, the Court stated that "the [Equal Protection Clause of the Fourteenth Amendment to the] Constitution does not permit ... the exclusion of otherwise qualified citizens from the franchise" when their interests will be affected by the election results. 399 U.S. at 209, 90 S.Ct. at 1994. Applying the literal language of § 9-514 to exclude non-taxpayers who are otherwise qualified to vote on an issue such as that presented by Question 1 would violate the constitutional principles discussed in *Kolodziejski*. We therefore affirm the trial court's decision to excise the unconstitutional "who are taxpayers" language from the statute, permitting all qualified electors of the Town to vote on Question 1.

Contestants argue that the trial court was without authority to delete the words "who are taxpayers" from the statute, contending that to do so "would totally change the focus of the remaining portion of the statute." Regarding the severability of statutory provisions, this court has stated:

> An entire statute need not and should not be declared unconstitutional if the constitutional portion can be separated.... If an unconstitutional provision of a statute can be eliminated, leaving a

---

3. Question 2—the bond issue—was submitted to the electors pursuant to A.R.S. § 9-523, which does not require voters on the issue to be tax-

payers. Contestants' appeal on this issue therefore is limited solely to Question 1.

complete statute, whose meaning and effect is not repugnant to the original law, the remainder of the act will stand.... If part of an act is unconstitutional, but by eliminating the unconstitutional portion the balance of the act is workable, only that part which is objectionable will be eliminated and the balance will be left intact.

*State v. Jones,* 142 Ariz. 302, 305–06, 689 P.2d 561, 564–65 (App.1984). In addition, "it is not absolutely essential to severability that the constitutional and unconstitutional features be contained in separate sections." *State v. Snyder,* 25 Ariz.App. 406, 408, 544 P.2d 230, 232 (1976).

"The test for severability is whether the elimination of a part of the statute will result in the remaining sections making little sense in expressing the intent of the legislature." *State v. Book–Cellar, Inc.,* 139 Ariz. 525, 533, 679 P.2d 548, 556 (App. 1984). *See also Cohen v. State,* 121 Ariz. 6, 9, 588 P.2d 299, 302 (1978) ("The test for severability is ... one of ascertaining the legislative intent"). We agree with the trial court, which stated:

> [T]he intent of the Legislature in enacting § 9–514 and § 9–523 was to enable those citizens having an interest to have a say in determining whether their Town would be allowed to engage in the business of operating a public utility and whether their Town would be allowed to issue bonds to finance same.

Because we have determined that taxpayers and non-taxpayers had the same interest in the issues presented at the election, deleting the words "who are taxpayers" from § 9–514 does not contravene legislative intent. Thus, the election need not be invalidated because non-taxpayers voted on Question 1.

For the foregoing reasons, we affirm the judgment of the trial court confirming the election.

GREER, J., concur.

NOTE: The Honorable Robert J. Corcoran, Justice of the Arizona Supreme Court, has been authorized by Administrative Order No. 89–3 of the Chief Justice, to participate in the resolution of this case which was previously assigned to him as a judge of this Court or to his department before Thursday, January 5, 1989.

FIDEL, Judge, specially concurring:

Although I join in the decision of my colleagues, I write separately to discuss one portion of their rationale.

The court's opinion points out that in this case, because of punch card irregularities, "the testimony of the ineligible voters would not clearly establish how they *actually* voted ... but would merely indicate how they *intended* to vote, and thus would not establish that the illegal votes actually changed the result of the election." The court finds the *Grounds* rule of proportional deduction applicable "here, where determining how the illegal votes were cast would be impossible even if the ineligible voters testified."

Some readers might infer from this language the converse—that is, that the *Grounds* rule would not apply whenever the testimony of ineligible voters would establish how the illegal votes were cast. The majority does not indicate that it intends that implication. I write in separate concurrence to state that I do *not* intend that implication.

Division Two has recently held that an ineligible voter "may be compelled to disclose for whom he voted", unless the witness invokes the fifth amendment privilege against self-incrimination. *Babnew v. Linneman,* 154 Ariz. 90, 95, 740 P.2d 511, 516 (App.1987). That court, however, did not address itself to the status of a voter who casts an illegal vote, but does so in good faith, and who does not wish to disclose his vote. Nor did the *Babnew* court consider the application of Ariz. Const. art. VII, § 1, which provides that in all elections, "secrecy in voting shall be preserved."

The *Grounds* approach is imperfect, as the supreme court acknowledged upon its adoption, 67 Ariz. at 183, 193 P.2d at 451–52. Yet it has many advantages in a multidistrict election. It avoids the expense, delay, and disenfranchisement of setting

aside the entire election. It is far fairer than the alternative of ignoring illegal votes, and certifying the election notwithstanding. And additionally—not the least of its advantages in my view—it permits the courts to avoid the democratic anathema of compelling good faith voters to reveal their votes.