24 P.3d 1285

Barbara J. SHERMAN; Thomas L. Sherman; Eleonore Curran; Nancy Goren; Gary Goren; Carole Hunsinger; Jalma W. Hunsinger; Catherine M. Mancini; And Dominic D. Mancini, Contestant, Plaintiffs–Appellants,

v.

CITY OF TEMPE and Neil Giuliano, Contestee, Defendants–Appellees.

No. 1 CA–CV 00–0348.

Court of Appeals of Arizona, Division 1, Department D.

June 5, 2001.

Brown & Bain, P.A., by Paul F. Eckstein and John A. Buttrick and Shelley D. Cutts, Phoenix, Attorneys for Contestant, Plaintiffs–Appellants.

C. Brad Woodford, Tempe City Attorney, by C. Brad Woodford and Janis L. Bladine, Assistant City Attorney and Clifford L. Mattice, Assistant City Attorney, Tempe, Attorneys for Contestee, Defendants–Appellees.

Arizona Center for Law in the Public Interest, by Timothy M. Hogan and Karen Kahler, Phoenix, Attorneys for Amicus Curiae.

## OPINION

GARBARINO, Presiding Judge.

¶ 1 From the inception of statehood, Arizona's public policy has been to have an informed electorate. Indeed, this policy is firmly embodied in our constitution. To further the constitutional policy of adequately informing the state's voting population, the legislature has enacted statutes that require cities, under certain circumstances, to distribute publicity pamphlets that inform the voters of the nature and details of the issues placed on the ballot. Adhering to this longstanding policy, we hold that a city's failure to timely distribute publicity pamphlets examining charter amendments prior to the distribution of early ballots to qualified voters violates this policy and frustrates the intent of our legislature and the drafters of our constitution.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 The parties presented this case to the trial court based upon the following stipulated facts. The City of Tempe scheduled a general election for May 16, 2000. Included on the general election ballot was Proposition 100, entitled "Proposed Amendments to the City Charter by the City Council." Proposition 100 proposed changing the City's mayoral term from two years to four years, beginning with the mayoral term commencing on or after July 1, 2000.

¶ 3 Mayor Neil Giuliano received a majority of the votes cast in the City's primary election held on March 14, 2000. Because Mayor Giuliano had won the election at the primary, the general election ballot contained no listing for the office of mayor. Mayor Giuliano's re-election became effective on May 16, 2000, election day for the general election, and his term of office began on July 1, 2000.

¶ 4 On or about April 13, 2000, Maricopa County, acting pursuant to an intergovernmental agreement with the City, mailed approximately 15,000 ballots for the May 2000 general election to persons who had requested early ballots. On April 17, 2000, the City opened a polling place for early voting at the Tempe Public Library. By the close of business on April 27, 2000, nearly 7000 voters had cast early ballots for the general election, either by mail or in person at the Tempe Public Library polling place.

¶ 5 On or about April 28, 2000, City officials mailed publicity pamphlets to voters for the general election. The publicity pamphlets included the text of Proposition 100, the City Attorney's analysis of the proposition, two citizen arguments against the proposition, and no citizen arguments in favor of the proposition.

¶ 6 After the election, the official tally of votes revealed that 9155 "yes" votes were cast in favor of Proposition 100, and 5650 "no" votes were cast against the proposition. Thus, of the 14,805 votes cast in the election, nearly half were cast before the publicity pamphlets were mailed to voters.

¶ 7 The plaintiffs filed a special action complaint and statement of election contest pursuant to A.R.S. sections 16–672 through 16–674 (1996), contesting the general election results of Proposition 100. The complaint alleged that Proposition 100 was invalid because the publicity pamphlets were not timely mailed pursuant to A.R.S. sections 19–123

(Supp.2000) and 19–141(A) (Supp.2000), and because it was an unconstitutional special law.

¶ 8 The City and Mayor Giuliano moved to dismiss the complaint, arguing that the publicity pamphlet requirement did not apply, or that if it did apply, the pamphlets were timely mailed as provided by statute. The plaintiffs responded to the motion and filed a trial memorandum. In addition, the parties submitted a statement of stipulated facts. The trial court treated the motion as a motion for summary judgment and, after oral argument, ruled that the publicity pamphlets were governed by Title 19, and that the City had timely provided them pursuant to A.R.S. section 19–141. The court also ruled that Proposition 100 was not an unconstitutional special law. The trial court entered final judgment on July 25, 2000, and the plaintiffs timely appealed.[1]

### ISSUES

¶ 9 The plaintiffs raise the following issues:

1. Whether Proposition 100 was subject to the publicity pamphlet requirements of A.R.S. sections 19–123 and/or 19–141(A);

2. Whether the publicity pamphlets were timely distributed pursuant to A.R.S. sections 19–123 and/or 19–141(A);

3. Whether the City's failure to timely distribute the publicity pamphlets invalidates the voters' approval of Proposition 100; and

4. Whether Proposition 100 is an unconstitutional special law because it applies retroactively to extend the term of a previously-elected mayor.

¶ 10 Because we conclude that the City untimely distributed the required publicity pamphlets and that the election results for Proposition 100 are therefore invalid, we need not reach the issue whether Proposition 100 is an unconstitutional special law.

1. The plaintiffs purport to appeal the whole of the trial court's judgment, with the exception of the trial court's determination that "Proposition 100 is a referendum authorized by the Constitu-

### DISCUSSION

¶ 11 We begin by recognizing Arizona's strong public policy favoring an informed electorate. This policy is evidenced by language contained in the Arizona Constitution, see Ariz. Const. art. 4, pt. 1, § 1(11) (requiring the publication of all proposed initiative and referendum measures); Ariz. Const. art. 21, § 1 (requiring the Secretary of State to publish all proposed constitutional amendments), and the legislature's enactment of A.R.S. section 19–123 (1990) (compelling the issuance of publicity pamphlets when ordered by the legislature or when initiatives or referenda are placed on the ballot); see also Fairness & Accountability in Ins. Reform v. Greene, 180 Ariz. 582, 588, 886 P.2d 1338, 1344 (1994) (recognizing that the legislature has a constitutional duty to inform the electorate regarding initiative proposals). With the underlying policy in mind, we discuss the issues raised in this matter.

■ ¶ 12 Because the facts in this case are not in dispute and "the question[s] presented involve[ ] statutory construction, we review the [trial] court's decision de novo." Kyle v. Daniels, 198 Ariz. 304, 305, ¶ 5, 9 P.3d 1043, 1044 (2000); Open Primary Elections Now v. Bayless, 193 Ariz. 43, 46, ¶ 9, 969 P.2d 649, 652 (1998) ("Because election contests are statutory proceedings, we evaluate appellants' argument by considering the applicable statutory scheme. We resolve questions of law involving statutory construction de novo.").

■ ¶ 13 We note that

"[t] he primary principle of statutory interpretation is to determine and give effect to legislative intent." The best and most reliable index of a statute's meaning is its language. That language, where clear and unequivocal, controls the statute's meaning unless it leads to absurd or impossible results. Where, instead, the statute's language is subject to different interpretations, the court is free to consult other sources of legislative intent such as the

tion and governed by Title 19." We conclude, however, that Proposition 100 was not a referendum measure and, therefore, disregard this qualification in the plaintiffs' notice of appeal.

statute's context, historical background, consequences, spirit and purpose. *Lowing v. Allstate Ins. Co.*, 176 Ariz. 101, 103–04, 859 P.2d 724, 726–27 (1993) (citations omitted) (quoting *Wyatt v. Wehmueller*, 167 Ariz. 281, 284, 806 P.2d 870, 873 (1991)). Additionally, we "must read the statute as a whole, and give meaningful operation to all of its provisions" whenever possible. *Wyatt*, 167 Ariz. at 284, 806 P.2d at 873 (citing *Kriz v. Buckeye Petroleum Co.*, 145 Ariz. 374, 377, 701 P.2d 1182, 1185 (1985)).

I. *The Requirement for Publicity Pamphlets*

¶ 14 The plaintiffs contend that Proposition 100 is invalid because the City failed to provide publicity pamphlets until nearly half of the voters had cast early ballots on the measure. The City contends that it was not required to distribute publicity pamphlets in connection with the vote regarding Proposition 100 because the proposed charter amendment was not a "referendum" within the meaning of the Arizona Constitution. We conclude that, although Proposition 100 was not a "referendum" within the meaning of the constitution, it nevertheless was subject to the statutory requirement that a publicity pamphlet be distributed.

¶ 15 The Arizona Constitution reserves to the people of the state the powers of initiative and referendum, and describes these powers in some detail. Ariz. Const. art. 4, pt. 1, § 1. The referendum power allows voters, by submitting a petition signed by five percent of the qualified electors, to "order the submission to the people at the polls of any measure, or item, section, or part of any measure, enacted by the Legislature." Ariz. Const. art. 4, pt. 1, § 1(3). Additionally, the constitution provides that the state legislature has the power of referendum, stating that "the Legislature . . . may order the submission to the people at the polls of any measure, or item, section, or part of any measure, enacted by the Legislature. . . ." *Id.*

¶ 16 The constitution also reserves the power of initiative and referendum "to the qualified electors of every incorporated city, town, and county as to all local, city, town, or county matters on which such incorporated

cities, towns, and counties are or shall be empowered by general laws to legislate." Ariz. Const. art. 4, pt. 1, § 1(8). The constitution does not, however, give the power of referendum to local governing bodies, such as the Tempe City Council.

¶ 17 The legislature enacted A.R.S. sections 19–101 through 19–143 to implement the constitution's initiative and referendum provisions. Section 19–123 requires the Secretary of State to distribute publicity pamphlets to voters when legislative acts are referred to the voters, either by the legislature or by the people through the initiative or referendum process:

When the secretary of state is ordered by the legislature, or by petition under the initiative and referendum provisions of the constitution, to submit to the people a measure or proposed amendment to the constitution, he shall cause to be printed, at the expense of the state, . . . a publicity pamphlet. . . .

A.R.S. § 19–123(A); *see also Clay v. Town of Gilbert*, 160 Ariz. 335, 340, 773 P.2d 233, 238 (App.1989). Section 19–141(A) makes this provision applicable to cities and towns:

The provisions of this chapter shall apply to the legislation of cities, towns and counties, except as specifically provided to the contrary in this article. The duties required of the secretary of state as to state legislation shall be performed in connection with such legislation by the city or town clerk, county officer in charge of elections or person performing the duties as such.

A.R.S. § 19–141(A); *see also Clay*, 160 Ariz. at 340, 773 P.2d at 238 (applying a former version of A.R.S. section 19–141(A)).

¶ 18 The parties dispute whether Title 19 required the City to mail a publicity pamphlet to the voters regarding Proposition 100. The parties agree that Proposition 100 was not an "initiative," but dispute whether it was a "referendum" subject to the requirement that a publicity pamphlet be distributed to voters. *See* A.R.S. § 19–123 (addressing printing and distribution of publicity pamphlets); A.R.S. § 19–141 (considering initia-

tives and referenda in counties, cities, and towns).

■ ¶ 19 Generally, the governing bodies of cities and towns do not have the power under the referendum provisions of the Arizona Constitution and Title 19 to voluntarily refer ordinances to a vote of the people. *See City of Scottsdale v. Superior Court*, 103 Ariz. 204, 206, 439 P.2d 290, 292 (1968); Ariz. Const. art. 4, pt. 1. The Arizona Constitution requires, however, that amendments to a town's charter proposed by its town council must be submitted to the people for approval. Ariz. Const. art. 13, § 2 ("The charter ... may be amended by amendments proposed and submitted by the legislative authority of the city to the qualified electors thereof ...."). Moreover, as the court in *City of Scottsdale* noted, A.R.S. section 19–143 expressly provides for the referral or submission to the people of amendments to a city's charter. *103 Ariz. at 206, 439 P.2d at 292*. Thus, the Tempe Town Council clearly had the obligation to refer the proposed charter amendment to the voters for approval. The City, relying on *Clay*, contends that because such a referral is mandatory, not voluntary, it does not qualify as a "referendum" subject to the publicity pamphlet requirements. We agree that the charter amendment is not a referendum measure, but we disagree with the City that Proposition 100 was not subject to the publicity pamphlet requirement of the election statutes.

¶ 20 In *Clay*, the Gilbert Town Council adopted a resolution calling for a special election to determine whether Gilbert should acquire an electricity distribution system and whether Gilbert should issue revenue bonds to finance the system's acquisition and operation. 160 Ariz. at 337, 773 P.2d at 235. The state statutes specifically required that both the decision to acquire the distribution sys-

tem and the decision to issue bonds to fund it must be authorized by the voters. *Id.* at 340–41, 773 P.2d at 238–39. The parties disputed whether this submission to the voters was a "referendum" subject to the publicity pamphlet requirements of Title 19. *Id.* at 340, 773 P.2d at 238. This Court held that there was no express authority for a town to "*voluntarily* refer matters to the electorate." *Id.* at 340–41, 773 P.2d at 238–39. Gilbert was statutorily required to submit the matter to the voters, and, therefore, the matter was not a "referendum" and the publicity pamphlet requirements did not apply. *Id.*

¶ 21 Similarly, in this case, both the Arizona Constitution and the Tempe Town Charter required the Tempe Town Council to submit to the voters for approval any proposed charter amendments. Ariz. Const. art. 13, § 2 ("The charter ... may be amended by amendments proposed and submitted by the legislative authority of the city to the qualified electors...."); Tempe Town Charter, § 9.02 ("All proposed amendments *shall* be submitted to the qualified electors of the city ...." (emphasis added)). Thus, under the reasoning in *Clay*, the vote regarding Proposition 100 was not a "referendum" because the town council had no discretion regarding whether to submit the proposed charter amendment to the voters.[2]

¶ 22 Our conclusion that Proposition 100 was not a "referendum" does not end the inquiry, however. *Clay* did not address a charter amendment, and therefore did not consider the impact of A.R.S. section 19–143(C), which provides:

> Amendments to a city or town charter may be proposed and submitted to the people by the council ... but they *shall be filed with the clerk for submission* not less than sixty days before the election at which they are to be voted upon, and no amendment of a charter shall be effective

---

2. We note that our supreme court's decision in *City of Scottsdale* states that the referral to the people of charter amendments is "voluntary." 103 Ariz. at 206, 439 P.2d at 292. The language of A.R.S. section 19–143(C) states, however, that "no amendment of a charter shall be effective until it is approved by a majority of the votes cast thereon by the people of the city or town to which it applies," and thus, does not lead to a

conclusion that submission of a charter amendment to the voters is "voluntary." In addition, the express language of article 13, section 2 of the Arizona Constitution, and the express language in section 9.02 of the Tempe Town Charter, require that the Tempe Town Council submit any proposed charter amendment for approval by the people in order for the amendment to become effective.

until it is approved by a majority of the votes cast thereon. . . .

Once a ballot item is submitted to the city clerk under Title 19, the clerk is required to perform "[t]he duties required of the secretary of state as to state legislation." A.R.S. § 19–141(A). Those duties include preparing a publicity pamphlet. *See* A.R.S. § 19–123(A). Regardless of whether a proposed charter amendment is a "referendum," the statutes in Title 19, read together and in harmony, advance the legislature's intent to require publicity pamphlets to be distributed to voters in connection with proposed charter amendments.

▪ ¶ 23 This conclusion is supported by Arizona's public policy in favor of an informed electorate. *See Fairness and Accountability in Ins. Reform*, 180 Ariz. at 588, 886 P.2d at 1344 (concluding that the legislature has a constitutional duty to provide procedures for informing voters about initiative proposals); *Kerby v. Griffin*, 48 Ariz. 434, 447, 62 P.2d 1131, 1137 (1936) (stating that "in order to secure wise legislation," voters must "be fully informed as to the nature and details of the measure upon which they are called to pass"). While A.R.S. section 19–123(A) does not require cities to distribute a publicity pamphlet for every measure submitted to the people for a vote, public policy supports an interpretation of Title 19 that requires cities to provide information to voters regarding proposed amendments to the town charter.

## II. *The Publicity Pamphlets Issued Were Untimely*

¶ 24 The directions contained in sections 19–123 and 19–141 differ regarding when publicity pamphlets must be distributed to voters. Section 19–123, the section generally applicable to the State, provides that the pamphlets "shall be mailed in order to be delivered to households before the earliest date for receipt by registered voters of any requested early ballots for the general election." A.R.S. § 19–123(B). Section 19–141,

applying specifically to counties, cities, and towns, states that the pamphlets must be distributed "either by mail or carrier, not less than ten days before the election at which the measures are to be voted upon." A.R.S. § 19–141(A).

¶ 25 The City contends that section 19–141(A) applies specifically to city elections, and that it complied with the statute because the pamphlets were distributed on April 28, 2000, which was more than ten days before the May 16, 2000 "election date ." The plaintiffs argue that section 19–123(B) is the relevant statute because it specifically applies to the situation in which early ballots are requested, whereas section 19–141 does not mention early ballots.

¶ 26 We conclude that section 19–141 is the applicable statute because it specifically applies to city elections. Subsection (A) states that "[t]he provisions of this chapter [Section 19–101 through 19–143] shall apply to the legislation of cities ... except as specifically provided to the contrary in this article." A.R.S. § 19–141(A). Because the article then specifically sets forth a different ("contrary") method and time for distribution of publicity pamphlets than is provided in the other provisions of Title 19, the provision set forth in this article controls over the provision in section 19–123(B), which otherwise would apply.

▪ ¶ 27 Even under section 19–141, the City did not timely distribute the publicity pamphlets. Section 19–141 requires that the pamphlets be distributed "not less than ten days *before the election at which the measures are to be voted upon.*" A.R.S. § 19–141(A) (emphasis added). The City contends this means ten days before the official day of election, which in this case was May 16, 2000. The statute, however, does not refer to the official day of election, nor does it specifically define the term "election." In the absence of a specific definition in the statute, we apply the commonly understood meaning of the term.[3]

---

**3.** The City contends that A.R.S. section 16–204(B) requires all "elections" to occur on only four specific days of the year, thus defining the term "election" to mean those specific election days. Section 16–204 declares that "for the purposes of increasing voter participation and for decreasing the costs to the taxpayers ... all elections in this state [must] be conducted on a

¶ 28 The dictionary defines "election" as "[t]he act or power of electing." The American Heritage Dictionary of the English Language 592 (3rd ed.1992). "Election day," by contrast, is defined as "[a] day set by law for the election of public officials." *Id.* Thus, the commonly understood meaning of the term election includes more than just a single official day designated as "election day." We conclude that A.R.S. section 19–141(A) requires the publicity pamphlets to be distributed at least ten days before any voting may occur, that is, ten days before a city places ballots in the hands of early voters.

¶ 29 This interpretation gives meaning to the phrase "before the election at which the measures are to be voted upon." A.R.S. § 19–141(A). The relatively simple question that one must ask is, "When are voters actually going to vote on those measures being voted upon?" Here, the City's electorate did not vote upon Proposition 100 on only May 16, 2000; rather, they began voting when the early ballots were distributed and continued to vote until May 16, 2000. The publicity pamphlets were required to be distributed ten days before the early ballots were distributed.

¶ 30 This interpretation is also consistent with the legislative intent to provide publicity pamphlets so that voters may be informed about the issues upon which they will vote. A publicity pamphlet received by an early voter after the ballot has been cast frustrates both the intent of the drafters of our constitution and our legislature, and undermines the policy underlying the purpose for requiring publicity pamphlets. A publicity pamphlet distributed after many, if not all, of the qualified electors have already voted would be meaningless. The City's distribution of the publicity pamphlets ten days prior to the

May 16, 2000 official day of election disregards the legislative intent of informing those voters who take advantage of the opportunity to vote early on the issues. We decline to interpret the statute in this manner. *See State v. Medrano–Barraza,* 190 Ariz. 472, 474, 949 P.2d 561, 563 (App.1997) (declining to adopt the government's construction of a statute to avoid an absurd result).

III. *The Election Results for Proposition 100 Are Invalid*

¶ 31 The plaintiffs contend that nearly 7000 "illegal votes" were cast because of the City's untimely distribution of the publicity pamphlets, and that, therefore, the election results must be set aside. The City contends that when illegal votes are cast, the trial court must first apply the "proportional deduction rule" and should consider setting aside the election results only if the deductions would change the results of the election. *See generally Huggins v. Superior Court,* 163 Ariz. 348, 352, 788 P.2d 81, 85 (1990) (explaining the application of the proportional deduction rule).

¶ 32 Our review of the cases challenging election results reveals that, generally, our courts have applied the proportional deduction rule to elections in which the votes were cast by ineligible voters. *See, e.g., Huggins,* 163 Ariz. at 349, 788 P.2d at 82 ("Fifteen voters registered as independents or nonpartisans had been improperly permitted to vote Democratic Party ballots. The sixteenth illegal voter was a convicted felon whose electoral rights were unrestored."); *Grounds v. Lawe,* 67 Ariz. 176, 184–85, 193 P.2d 447, 452–53 (1948) (applying the proportional deduction rule to an election in which nonresidents had been permitted to vote);

limited number of days...." A.R.S. § 16–204(A) (Supp.2000). The statute then sets forth four dates on which "elections" may be held. A.R.S. § 16–204(B) (Supp.2000). Section 16–541 specifically requires that "[a]ny election called pursuant to the laws of this state shall provide for early voting." A.R.S. § 16–541(A) (Supp.2000).

Nothing in section 16–204(A) indicates that it is intended to define the term "election" as meaning the official day of election when the term is used in any statutes dealing with elections. Instead, subsection (B) of the statute sets

forth the dates when elections may occur. Moreover, nothing in either Title 16 or Title 19 indicates any intent to define "election" as including only one "election day." A more reasonable interpretation of section 16–204 is that it provides a set of dates by which voting on various matters must be completed and on which designated polling places must be open; voting officials are allowed (and even required) to allow voting during more than the one "election day." The early voting, combined with the election day voting, constitutes the "election."

*Clay,* 160 Ariz. at 338–39, 773 P.2d at 236–37 (applying the proportional deduction rule to a case in which nonresidents had been permitted to vote). By contrast, when the voters were in fact qualified electors, but the results of the election were challenged because the procedures set forth in the election statutes were not followed and the procedural irregularities may have affected the outcome of the election, courts have tended to invalidate the results of the election. *See, e.g., Miller v. Picacho Elementary Sch. Dist. No. 33,* 179 Ariz. 178, 180, 877 P.2d 277, 279 (1994) (reinstating the trial court's order setting aside an election because substantive irregularities had affected the election's result); *cf. Kerby,* 48 Ariz. at 436, 456, 62 P.2d at 1132, 1140 (upholding an injunction prohibiting the untimely distribution of pamphlets and the placement on the ballot of an initiative).

¶ 33 In this case, the plaintiffs do not contend that any of the early ballots were cast by non-qualified electors. Instead, they argue that City officials failed to comply with the election statutes' requirement that publicity pamphlets be distributed, and that this failure affected the outcome of the election. In this situation, we find *Kerby* and *Miller* most instructive.

¶ 34 In *Kerby,* the Secretary of State failed to timely print and distribute the required publicity pamphlets in connection with an initiative petition that had been filed. 48 Ariz. at 440–41, 62 P.2d at 1134. The supreme court began by explaining that our constitution requires publication notice to the public regarding measures submitted by initiative petition, and allows the legislature to enact legislation to implement the publication requirement. *Id.* at 447–48, 62 P.2d at 1136–37 (citing Ariz. Const. art. 4, pt. 1, § 1(11)). Thus, the court explained, the publicity pamphlet is as much of a mandatory election requirement as the requirement that the initiative petition be signed by a certain number of electors. *Id.* The court further explained:

> [W]hen the people are given the right and the duty of legislating directly, it is imperative, in order to secure wise legislation, that they be fully informed as to the nature and details of the measure upon which they are called to pass. We think, there-

fore, that the constitutional provision in regard to publicity must be substantially followed or the proposed law cannot be legally adopted.

*Id.* The court thus upheld the trial court's injunction prohibiting the Secretary of State from placing the initiative on the ballot and distributing the publicity pamphlets after the deadline for distributing them had passed. *Id.* at 456, 62 P.2d at 1140.

¶ 35 In *Miller,* the supreme court addressed a challenge to the results of a school district's budget override election. 179 Ariz. at 178, 877 P.2d at 277. The school district's employees had violated the requirement that absentee ballots be mailed to persons requesting them, by hand-delivering forty-one ballots to persons who had not requested them, and by urging them to vote for the override. *Id.* at 178, 180, 87 P.2d at 277, 279. The votes changed the result of the election. *Id.* at 180, 87 P.2d at 279. The court explained that

> election statutes are mandatory, not "advisory," or else they would not be law at all. If a statute expressly provides that non-compliance invalidates the vote, then the vote is invalid. If the statute does not have such a provision, non-compliance may or may not invalidate the vote depending on its effect. In the context of this case, "affect the result, or at least render it uncertain," means ballots procured in violation of a non-technical statute in sufficient numbers to alter the outcome of the election.

*Id.* (citation omitted). Because the irregularities in the absentee voting procedure affected the results of the election, the fact that the voters may have been qualified electors who voted their conscience was irrelevant. An "express non-technical statute was violated," and the ballots cast in violation of the statute affected the election. *Id.* Thus, the court set aside the election. *Id.*

¶ 36 Although the charter amendment at issue is not an initiative petition, we find *Kerby*'s reasoning applicable. The legislature has required that a publicity pamphlet be prepared in connection with proposed charter amendments, and this requirement is no less mandatory than the other procedures

required by the election statutes. Similarly, while it is less clear than in *Miller* that the failure to comply with the election laws in fact affected the outcome of the election, it is obvious that the failure to distribute the pamphlets may have "affect[ed] the result, or at least render[ed] it uncertain," *Miller,* 179 Ariz. at 180, 877 P.2d at 279 (quoting *Findley v. Sorenson,* 35 Ariz. 265, 269, 276 P. 843, 844 (1929)), because the number of votes submitted before the City distributed the publicity pamphlets was sufficient to alter the outcome of the election. Thus, the City's failure to timely distribute the publicity pamphlets is fatal to the validity of the election regarding Proposition 100, and the election results must be set aside.[4] We therefore reverse the trial court's judgment.

**4.** The court in *Kerby* further noted the general rule that statutory directions must be strictly upheld in actions instituted before an election, but after an election, only "substantial compliance" must be shown. 48 Ariz. at 452, 62 P.2d at 1138–39. Even assuming that the substantial

## CONCLUSION

¶ 37 For the foregoing reasons, we reverse the trial court's judgment and remand with directions to the trial court to set aside and declare the election results with regard to Proposition 100 invalid.

CONCURRING: E.G. NOYES, JR., Judge, MICHAEL D. RYAN, Judge.

compliance rule applies to this case, however, distribution of publicity pamphlets more than ten days *after* the initial date early ballots were distributed is not "substantial compliance" with the statutory *requirement* that publicity pamphlets must be distributed ten days *before* that date.